UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASTELLAS US HOLDING, INC., and ASTELLAS PHARMA US, INC., <br><br> Plaintiffs, <br><br> v. <br><br> STARR INDEMNITY AND LIABILITY COMPANY, BEAZLEY INSURANCE COMPANY, INC., and FEDERAL INSURANCE COMPANY, <br><br> Defendants. | No. 17 CV 8220 <br><br> Judge Manish S. Shah |

## MEMORANDUM OPINION AND ORDER

The government issued a subpoena to Astellas Pharma, Inc., demanding the production of documents, and later entered into an agreement with Astellas Pharma US to toll the statute of limitations on possible violations of criminal law. Plaintiffs Astellas US Holding and Astellas Pharma US bring this action against their insurers, Starr Indemnity and Liability Company, Beazley Insurance Company, and Federal Insurance Company, for denying coverage for the expenses incurred in response to the government's investigation. Each of the defendants move to dismiss plaintiffs' amended complaint because, they say, the policies cover losses from claims for wrongful acts and neither the subpoena nor the tolling agreement count as covered claims. For the following reasons, those motions are denied.

## I. Legal Standards

A motion to dismiss under Rule 12(b)(1) challenges the court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The plaintiff bears the burden of establishing the elements necessary for subject-matter jurisdiction. *Scanlan v. Eisenberg*, 669 F.3d 838, 841–42 (7th Cir. 2012). By contrast, a Rule 12(b)(6) motion "tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). The complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When analyzing a motion under Rule 12(b)(1) or Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Scanlan*, 669 F.3d at 841; *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). The court need not accept legal conclusions or conclusory allegations, however. *Virnich*, 664 F.3d at 212.

## II. Background

Historically, pharmaceutical companies sponsored patient assistance programs that subsidized the purchase of drugs for certain Medicare beneficiaries. [39] ¶ 19.[1] For example, plaintiffs made charitable contributions to organizations that assisted financially needy patients, and some of those patients may have taken drugs sold by plaintiffs. *Id.* ¶ 26. The Department of Health and Human Services, Office of Inspector General, announced that these programs risked violating the anti-kickback statute, and beginning January 1, 2006, Medicare Part D

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings.

2

beneficiaries would no longer be eligible to participate in patient assistance programs. *Id.*¶ 19. In May 2014, the OIG issued a supplemental bulletin to provide additional guidance regarding patient assistance programs that were operated by independent charities and that provided cost-sharing assistance for prescription drugs. *Id.* ¶ 20.

On March 3, 2016, the United States Department of Justice issued a subpoena to plaintiffs demanding certain documents relating to the DOJ's industry-wide investigation of pharmaceutical companies for alleged "Federal health care offenses." *Id.* ¶ 21. The subpoena commanded plaintiffs to appear before government officials and to produce documents about plaintiffs' payments to charitable organizations that provided financial assistance to patients taking plaintiffs' drugs. *Id.* ¶ 24; [39-4]. It advised plaintiffs that failure to comply exposed them to liability in judicial enforcement proceedings and punishment for disobedience. [39-4]. Although the DOJ formally addressed the subpoena to Astellas Pharma, Inc., plaintiffs' Japanese parent company, the subpoena also used the term "You," which the subpoena defined as including the parent company's subsidiaries. [39] ¶ 22; *see also* [39-4]. Astellas Pharma US, the U.S.-based subsidiary, was the only relevant entity for purposes of the subpoena because plaintiffs' parent company never provided charitable contributions to the patient assistance programs at issue in the subpoena.[2] [39] ¶ 22.

---

[2] The complaint also alleges that the DOJ entered into an agreement with plaintiffs that the subpoena would apply to plaintiffs, not just plaintiffs' parent company. [39] ¶ 22.

Although the government's position is not stated in the subpoena, the DOJ alleged that plaintiffs' contributions to independent charity patient assistance programs violated applicable law. *Id.* ¶¶ 27–29. The investigation is ongoing; and the DOJ has subpoenaed additional documents from plaintiffs. *Id.* ¶ 30. On October 26, 2017, the DOJ entered into a "Limited Tolling Agreement on Statute of Limitations" with Astellas Pharma US, which states that the DOJ "is currently conducting a joint criminal and civil investigation of [] Astellas, and its officers, employees, and agents," and that "[t]he conduct being investigated includes, without limitation, the possible violation by Astellas . . . of various federal criminal statutes . . . in connection with Astellas's payments to '501(c)(3)' organizations that provide financial assistance to Medicare beneficiaries." *Id.* ¶ 31; *see also* [21-4]. The parties agreed to toll the applicable statutes of limitation for Astellas's possible violations of law in making payments to organizations that gave financial assistance to Medicare beneficiaries. [21-4].

After receiving the first subpoena, plaintiffs provided each of the defendants—the insurance companies—timely written notice of the subpoena. [39] ¶ 34. Plaintiffs' primary insurance policy came from Starr; that policy had a $5 million limit of liability excess of a $500,000 self-insured retention, *id.* ¶ 11, and it provided: "The Insurer shall pay on behalf of the Company the Loss arising from a Claim first made during the Policy Period . . . against the Company for any Wrongful Act, and reported to the Insurer in accordance with the terms of this policy," [39-1] at 18. In addition to its primary policy with Starr, plaintiffs also had

excess insurance policies with Beazley and Federal Insurance. Beazley's policy provided a $5 million limit of liability excess of the Starr policy's $5 million limit of liability and the applicable $500,000 self-insured retention. [39] ¶ 17. In order for the Beazley policy to apply, all of the underlying limits had to have been exhausted through payments of amounts covered under the Starr policy. *Id.* Federal provided a $10 million limit of liability excess of the Starr policy's and the Beazley policy's combined limits of $10 million and the applicable $500,000 self-insured retention. *Id.* ¶ 18. The Federal policy only covers a loss if all of the underlying limits have been exhausted through payments of amounts covered under the Starr and Beazley policies. *Id.*

In response to plaintiffs' notice of the subpoena, Beazley reserved its rights, noting that "[a]s an excess carrier, Beazley cannot have any coverage obligations until the underlying layer is exhausted," *id.* ¶ 35, and Federal acknowledged receipt of the notice, but stated that "it must reserve the right to raise all of the defenses available to it under the policy and the law," *id.* ¶ 36. Starr denied coverage, asserting that "the Subpoena does not currently fall within the scope of coverage afforded by the Policy" because "the definition of Claim requires . . . a written demand for monetary, non-monetary or injunctive relief made against an Insured. Here, there has been no written demand for relief made against any Insured[.] . . . The Subpoena simply requests that certain documents be produced." *Id.* ¶ 37. Beazley and Federal both adopted Starr's coverage positions, reservations of rights, and defenses. *Id.* ¶ 38.

Plaintiffs incurred defense costs that exceed the retention in the Starr policy. *Id.* ¶ 45. While plaintiffs have complied with all of the applicable conditions of Starr's policy, Starr has refused to pay the amounts owed under that policy. *Id.* ¶¶ 46–47. After deducting the self-insured retention, plaintiffs' defense costs have exceeded the limits of liability of the Beazley policy and the underlying limits of the Federal policy. *Id.* ¶ 50. Plaintiffs seek a declaration that Beazley and Federal must pay all reasonable and necessary costs of investigating and defending "this Claim," up to the respective limits of liability. *Id.* ¶ 54.

Starr moved to dismiss plaintiffs' complaint. [21]. Both Beazley and Federal Insurance joined that motion. [24] at 2; [26] at 2. Additionally, Beazley filed its own motion to dismiss plaintiffs' amended complaint, [24], and Federal Insurance joined that motion, [26] at 2. After the parties completed briefing defendants' motions to dismiss, plaintiffs moved for leave to file an amended complaint. [36] at 1 (citing Fed. R. Civ. P. 15(a)(2), 19). In that motion, plaintiffs explained their intention to address the issues defendants raised in their motions to dismiss by adding certain factual allegations. *Id.* at 2. I granted plaintiffs' motion for leave to file an amended complaint, and I permitted defendants to adopt the arguments they had raised in their motions to dismiss as well as in their responses to plaintiffs' motion for leave to amend the complaint. [40]. Plaintiffs filed a first amended complaint, [39], and defendants moved to dismiss the amended complaint, adopting their previous arguments, [41]; [42]; [43].

## III. Analysis

Plaintiffs brought this action against Starr for breaching its duty under the policy to pay for a loss plaintiffs suffered. Starr's policy provides: "The Insurer shall pay on behalf of the Company the Loss arising from a Claim . . . against the Company for any Wrongful Act." [39-1] at 18. The parties dispute whether there was: (1) a "Claim" (2) that was asserted against the "Company" (3) for a "Wrongful Act." Courts must interpret the terms of an insurance policy in the context of the entire policy and the parties' intentions. *Emp'rs Ins. of Wausau v. James McHugh Constr. Co.*, 144 F.3d 1097, 1104 (7th Cir. 1998); *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill.2d 278, 292 (2001). If the policy language is unambiguous, as it is here, courts ascertain the parties' intent from the language's plain, ordinary, and popular meaning. *Travelers Ins.*, 197 Ill.2d at 292–93. Applying these standards to the allegations of the amended complaint leads to a conclusion in favor of coverage.

The policy defines a "Wrongful Act," in relevant part, as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company." [39-1] at 21–22. Plaintiffs allege that the DOJ told them that the DOJ contended that plaintiffs' donations to independent charity patient assistance programs violated the law and did not comport with the OIG bulletins. [39] ¶ 27. The DOJ issued the subpoena to plaintiffs because of these allegedly unlawful acts. *See id.* ¶ 29. And because the DOJ alleged that plaintiffs charitable contributions were unlawful, those acts constitute an "alleged . . . error, . . . , or act" under the policy. *See* [39-1] at 22. These allegations in the complaint are

sufficient to allege that plaintiffs were accused of committing wrongful acts under the policies, and that the DOJ issued the subpoena in response to plaintiffs' wrongful acts.

Plaintiffs allege that the DOJ requested that they enter into a tolling agreement. [39] ¶ 31. The tolling agreement stated that the DOJ is "conducting a joint criminal and civil investigation" of plaintiffs' "possible violation . . . of various federal criminal statutes." [21-4] at 2. Since the policy's definition of a "Wrongful Act," includes an "alleged . . . act," [39-1] at 22, the tolling agreement's reference to a "possible violation," together with the allegation that the government told plaintiffs that Astellas's conduct violated the law, is enough to allege that the DOJ entered into the agreement because of plaintiffs' wrongful act.

The policy's definition of "Company" includes the "Parent Company" as well as "any Subsidiary of the Parent Company." *Id.* at 7. Astellas US Holding is listed as the "Parent Company" in the policy, *id.* at 2, and plaintiffs allege that the policy also covers Astellas Pharma US. [39] ¶ 22 ("APUS (an Insured under the Policy)"). Drawing all reasonable inferences in plaintiffs' favor, I conclude that Astellas Pharma US is a subsidiary of Astellas US Holding under the policy. As a result, Astellas Pharma US and Astellas US Holding are each the "Company" under the policy.[3]

---

[3] Starr argues that plaintiffs have not established that Astellas Pharma US is a "Subsidiary" of Astellas US Holding—the named insured parent company in the policy–and as a result, the policy does not cover Astellas Pharma US. [33] at 2 n.2. I reject Starr's argument because I accept plaintiffs' factual allegation that Astellas Pharma US is an insured under the policy. *See* [39] ¶ 22. The corporate relationships between the entities, with some factual development, is likely to be undisputed, but for now, I read the complaint

8

The policy defines "Claim" as any:

> (1) written demand for monetary, non-monetary or injunctive relief made against an Insured;
> (2) judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief commenced against an Insured, including any appeal therefrom, which is commenced by:
> > (i) service of a complaint or similar pleading;
> > (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or
> > (iii) receipt or filing of a notice of charges;
> (3) arbitration proceeding commenced against an Insured by service of a demand for arbitration;
> (4) formal civil, criminal, administrative or regulatory investigation of an Insured Person, which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying such Insured Person as a person against whom a proceeding identified in (2) or (3) above may be commenced;
> (5) written request to toll or waive the applicable statute of limitations relating to a potential Claim against an Insured for a Wrongful Act; or
> (6) Derivative Demand, solely under Insuring Agreement D. if purchased by the Insured.

[39-1] at 18–19. The subpoena satisfies subpart (1) because it is a written demand for plaintiffs to appear before government officials and to produce specific documents. This is a demand for non-monetary relief. The tolling agreement satisfies subpart (5) because the agreement informs Astellas Pharma US that the DOJ is "conducting a joint criminal and civil investigation" of plaintiffs' "possible violation . . . of various federal criminal statutes." [21-4] at 2. It continues: "[we] have agreed . . . to toll the applicable statutes of limitation . . . for the conduct described [above.]" *Id.* It also warns Astellas Pharma US that it "may be charged with any of the foregoing offenses or violations and/or any other offenses." *Id.* at 3.

---

to allege that Astellas Pharma US is a subsidiary of Astellas US Holding and that plaintiffs will prove that fact.

9

This language is the equivalent of a "written request to toll . . . the applicable statute of limitations relating to a potential Claim against an Insured for a Wrongful Act." *See* [39-1] at 19. The potential "Claim" being both the subpoena and a potential indictment for violations of federal criminal law based on payments to organizations subsidizing Medicare beneficiaries' purchase of plaintiffs' drugs, the "Insured" being Astellas Pharma US, and the "Wrongful Act" being plaintiffs' "potential violation," as discussed above.

In sum, I conclude that plaintiffs have sufficiently alleged that the DOJ asserted two claims against Astellas Pharma US for a wrongful act. And, I reject Starr's arguments to the contrary. Although Starr agrees that the policy language is unambiguous and should be read to give its plain meaning, Starr disagrees that a "demand for relief" includes production of documents in response to a subpoena. Starr defines "relief" as "legal remedy or redress," or as "'[t]he redress or benefit,' especially 'equitable in nature (such as an injunction or specific performance), that a party asks of a court.'" [21] at 9 (citing as *MusclePharm Corp. v. Liberty Ins. Underwriters, Inc.*, 712 Fed. App'x. 745, 754 (10th Cir. 2017) (citing *Relief*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/relief (last visited May 29, 2018); *Relief*, BLACK'S LAW DICTIONARY (10th ed. 2014)), and because the subpoena only seeks information and does not make a request of the court, Starr concludes that they do not fit within the plain meaning of a demand for relief.[4] The threatened enforcement proceedings are discrete from the informational

---

[4] Starr emphasizes that "the most recent Illinois case" to consider this issue "expressly rejected" the notion that subpoenas qualify as written demands for relief. [21] at 9 (citing

investigation, the argument goes. *Id.* at 11 (citing *Ctr. for Blood Research, Inc. v. Coregis Ins. Co.*, 305 F.3d 38, 43 (1st Cir. 2002)). But, the complaint alleges that the DOJ had determined that plaintiffs violated federal health care laws, and it is reasonable to infer that enforcement proceedings would swiftly follow any non-compliance by the plaintiffs in response to the subpoena. In this context, I do not conclude that the subpoena merely *requested*, as opposed to *demanded*, information. Because courts may compel parties to give testimony or to produce documents as demanded in the subpoena, I also conclude that the subpoena demanded a form of non-monetary relief and that the subpoena was not distinct from the potential enforcement proceedings—it defined the scope of the judicial enforcement.

Starr also argues that interpreting the policy to allow the subpoena to fall within subpart (1) would render subpart (4) superfluous, and courts must interpret policies to give effect to each provision. *Id.* at 11 (citing *Cincinnati Ins. Co. v. Gateway Const. Co.*, 372 Ill.App.3d 148, 152 (1st Dist. 1992)). Subpart (1) is broader than subpart (4), but as plaintiffs observe, each of the policy's subparts offer alternative forms of coverage; they do not limit one another. Any overlap between

---

*Fed. Ins. Co. v. Ill. Funeral Director's Ass'n*, 2010 WL 5099979 (N.D. Ill. 2010)). Starr's description of *Federal Insurance* is inaccurate, though. That court did not consider whether grand jury subpoenas were a demand for relief; rather, the court decided that the subpoenas did not satisfy the definition of a "Claim" under that policy because they were not directed to "Insured Persons" and they did not allege that the defendants had engaged in any "Wrongful Acts." *Fed. Ins.*, 2010 WL 5099979 at *4. It is true that the court considered the contours of a "demand for relief" under the relevant policy, but the court only did so with respect to a letter from the Illinois Office of the Comptroller. In considering that question, the court rejected the defendants' attempts to frame the letter as a request for responses to routine audit findings, and the court concluded that the letter was a written demand for nonmonetary relief under the policy because: (1) the letter described the audit findings as "an intolerable situation that [the company] must rectify," and (2) the letter threatened to take action against the business if it did not timely respond. *Id.* at *5.

11

the subparts is by design. Subpart (4) is also different because it covers an investigation of an insured person against whom a proceeding may be commenced, but arguably does not require a present demand for relief against that person. My interpretation of subpart (1) does not make subpart (4) superfluous.[5]

Relatedly, Starr argues that plaintiffs' interpretation would lead to an absurd result, [21] at 11 (citing *Foxfield Realty v. Kubala*, 287 Ill.App.3d 519, 524 (2d Dist. 1997)), because the policy is only meant to protect insureds from potential liability due to allegations of wrongdoing, which the subpoena lacked. But I disagree with Starr's characterization of the subpoena. The broad definition of a "Claim," which includes overlapping subparts, indicates that the policy was designed to cover something like the subpoena—which is a demand for relief in response to an accusation of wrongdoing. Thus, the "result" in this insistence—that Starr may have to cover plaintiffs' costs related to the subpoena—is not absurd, it is precisely what the policy intended.

Regardless of whether the subpoena satisfies subpart (1), Starr asserts that the subpoena is not a "Claim" under the policy because there is nothing to support a finding that this document was issued "for a Wrongful Act," as required by the policy. *See* [39-1] at 18. Starr notes that the subpoena does not state or allege that plaintiffs made improper charitable contributions or that the plaintiffs committed any other wrongdoing. In fact, the subpoena was issued under 18 U.S.C. § 3486,

---

[5] For these same reasons, I reject Beazley's related argument that the more "specific" language in subpart (4), and not the more "general" language in subpart (1), governs whether the subpoena is a "Claim" under the policy. *See* [24] at 12.

which grants the Attorney General authority to commence an investigation by issuing subpoenas even if the Attorney General has not identified a wrongful act. *See Ctr. for Blood Research*, 305 F.3d at 43. Starr points to the statute's language, which recognizes the likelihood that no case or proceeding may arise from the production of records in response to such subpoenas. *See* 18 U.S.C. § 3486(a)(8). Therefore, Starr concludes, this type of an administrative subpoena does not necessarily amount to an "allegation." [33] at 7 (citing *Employers' Fire Ins. Co. v. ProMedica Health Systems, Inc.*, 524 Fed. App'x. 241, 248 (6th Cir. 2013)).

Since the policy does not define "alleged," Starr urges the court to adopt the ordinary meaning of the term, which it defines as "asserted to be true as described" or "accused but not yet tried." [21] at 13–14 (citing *Employers' Fire Ins.*, 524 Fed. App'x. at 247). Yet, the policy only requires that a "Claim" was made "for any Wrongful Act." It is not necessary for the subpoena to include language that asserts that plaintiffs engaged in an actual or alleged wrongful act. Here, plaintiffs have alleged that the DOJ issued the subpoena because the DOJ had alleged that plaintiffs engaged in federal health care violations. That allegation provides a basis to conclude that the subpoena was issued "for" a "Wrongful Act," even if the subpoena itself did not contain the allegation.

With respect to the tolling agreement, Starr does not dispute that it is a "written request to toll" the statute of limitations under subpart (5); but, Starr disputes that the agreement relates to "a potential Claim" under subpart (5). To support this point, Starr refers to its original arguments about why the subpoena is

13

not a "Claim" under the policy. Having rejected that argument to conclude that the subpoena is a "Claim," I now find that the tolling agreement is related to a "Claim"—the subpoena. Nevertheless, Starr insists that the tolling agreement is not a "Claim" because it does not reference a "Wrongful Act." Starr emphasizes how the tolling agreement states that the DOJ is investigating the "possible violation" of various criminal statutes and that no decision on that investigation has been made. [21] at 14 (citing *Emplr's Fire Ins. Co.*, 524 Fed. App'x at 248, 250). This is not persuasive because the policy's definition of a "Wrongful Act" includes an "alleged . . . act" and Starr has not established that a "possible violation" does not fit within that definition. *See* [39-1] at 22. In addition, the complaint alleges that the government told plaintiffs that it believed the payments to patient assistance programs violated federal law. Consequently, I find that the complaint adequately alleges that the tolling agreement satisfies subpart (5) and constitutes a "Claim" under the policy. Defendants' motions to dismiss plaintiffs' amended complaint for failure to state a claim are denied.

Beazley and Federal Insurance argue that plaintiffs' claim for declaratory judgment should be dismissed for lack of subject-matter jurisdiction because the claim is not ripe for adjudication. They argue that as excess insurers, they are only obligated to cover plaintiffs' losses until the primary insurance policy has been exhausted. According to defendants, plaintiffs failed to allege that such exhaustion has occurred; thus, their policies have not been triggered and plaintiffs' claim is premature. Plaintiffs disagree; they point to allegations in the complaint that the

defense costs they have paid thus far have implicated the defendants' excess insurance policies. In the event that plaintiffs receive a favorable ruling with respect to their rights under Starr's policy, plaintiffs' argue that defendants' obligations to pay the full limits of liability under their policies will immediately become due.

"A suit is ripe when 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Cent. States, Southeast and Southwest Areas Health and Welfare Fund by Bunte v. Am. Int'l Grp., Inc.*, 840 F.3d 448, 451 (7th Cir. 2016) (citation omitted). When the declaratory judgment action involves an excess insurance policy, courts look to see whether the events that trigger the excess policy's coverage are likely to occur. *See Cushman & Wakefield, Inc. v. Ill. Nat'l Ins. Co.*, 2015 WL 2259647, at *4 (N.D. Ill. 2015). Accepting the allegations in the complaint as true, it is likely that plaintiffs have incurred enough costs to exhaust the relevant limits provided by the excess policies.[6] Since Starr has not paid plaintiffs the amounts it owes under the policy, the excess policies have not been triggered yet; but that is not enough to defeat jurisdiction here. A substantial controversy is brewing between the parties; plaintiffs need not wait for Beazley and Federal Insurance to breach their policies

---

[6] Beazley argues that the costs plaintiffs allege they have incurred are not eligible for reimbursement because those costs are beyond the scope of the policy's definition of "Defense Costs." *See* [24] at 8. At this stage of the litigation, I reject this argument because I accept plaintiffs allegations that "[t]he Defense Costs that Astellas has incurred to date exceed the applicable retention in the Starr Policy," [39] ¶ 45, and that "[t]he total Defense Costs, after deducting the self-insured retention, have exceeded the respective Underlying Limits of the Federal Policy and the Limits of Liability of the Beazley Policy," *id.* ¶ 50.

15

before bringing suit. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 137 (2007). Defendants' motions to dismiss plaintiffs' declaratory judgment claim are denied.

## IV. Conclusion

Defendants' motions to dismiss, [41], [42], and [43] are denied. Defendants shall answer the amended complaint by June 20, 2018 and a status hearing is set for June 26, 2018 at 9:30 a.m.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: May 30, 2018