## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ASTELLAS US HOLDING, INC. and
ASTELLAS PHARMA US, INC.,

        Plaintiffs,

       v.

STARR INDEMNITY & LIABILITY
COMPANY, BEAZLEY INSURANCE
COMPANY, INC., and FEDERAL
INSURANCE COMPANY,

        Defendants.

No. 17-cv-08220
Judge Franklin U. Valderrama

### MEMORANDUM OPINION AND ORDER

Plaintiffs Astellas US Holding, Inc. (AUSH) and Astellas Pharma US, Inc. (Astellas) (collectively, Plaintiffs), filed suit against Starr Indemnity & Liability Company (Starr), Beazley Insurance Company, Inc. (Beazley),[1] and Federal Insurance Company (Federal) (collectively, the Insurers) alleging breach of contract and seeking compensatory damages for the Insurers' alleged breaches of their duties under insurance policies they issued to Plaintiffs, which provide broad coverage for defense costs, judgments, and settlements arising from alleged wrongful acts committed by Astellas. R. 77, SAC.[2] Plaintiffs seek damages they suffered due to the

---

[1]Plaintiffs settled their claims against Starr and Beazley and filed joint motions to dismiss their claims against Starr (R. 92) and Beazley (R. 95). The Court granted the motions and terminated Starr and Beazley as parties (R. 94, 97). The Court therefore refers to the remaining parties, Plaintiffs and Federal, as "the Parties."

[2]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Insurers' refusals to reimburse them for defense costs (i.e., covered defense and investigation costs), as well as for a settlement payment that Plaintiffs paid to resolve a claim asserted against Astellas by the United States Department of Justice (DOJ) for alleged federal health care offenses committed by Astellas. SAC ¶ 2. Plaintiffs also seek a declaratory judgment that Federal must pay the full amount of its $10 million limit of liability. *Id.* ¶¶ 18, 61. Before the Court are Astellas' and Federal's cross-motions for summary judgment.[3] R. 114, Pl.'s Mot. Summ. J.; R. 129, Def.'s Cross-Mot. Summ. J.[4] For the reasons discussed below, Astella's Motion for Summary Judgment is granted and Federal's Cross-Motion for Summary Judgment is denied.[5] The Court finds that the Settlement Payment constitutes a Loss under the Federal Policy, and public policy does not bar coverage.

## Background

The following facts are undisputed unless otherwise specified. In deciding cross-motions for summary judgment, the Court views the facts in the light most

---

[3]Only Astellas, not AUSH, moved for summary judgment against Federal. Pl.'s Mot. Summ. J., whereas Federal moved for summary judgment against both Plaintiffs. Def.'s Cross-Mot. Summ. J. Both Plaintiffs joined the brief filed in reply in support of Astellas' motion for summary judgment and in opposition to Federal's cross-motion for summary judgment against Plaintiffs. R. 144, Pl.'s Reply/Cx-Resp. at 1 n.1. As noted herein, because AUSH is simply a holding company, for ease of reading, the Court uses "Astellas" to refer to both Plaintiffs or just Astellas, as appropriate, unless otherwise noted.

[4]Federal filed two versions of its cross-motion for summary judgment, one version under seal (R. 126) and one public, unsealed version (R. 129). A review of Federal's sealed motion shows that it is identical to the public, unsealed version of the motion, and does not contain any sensitive or confidential information. The Court therefore directs the clerk's office to unseal Federal's cross-motion for summary judgment [126].

[5]Together, the briefs, Local Rule 56.1 statements and responses, and evidence filed in support, consist of more than 995 pages. A comprehensive opinion was necessary in light of the voluminous record.

favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). So, when the Court evaluates Astellas' motion for summary judgment, Federal gets the benefit of reasonable inferences; conversely, when evaluating Federal's motion, the Court gives Astellas the benefit of the doubt. On summary judgment, the Court assumes the truth of the facts presented by the parties, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Astellas is a pharmaceutical company, of which AUSH owns 100% of the voting stock. Def.'s Resp. PSOF ¶¶ 1–2, 4.[6] Federal is an insurance company, which issued an excess policy, No. 822-5816 (the Federal Policy), to Astellas for the period of April 1, 2015 to April 1, 2016 (the **Policy Period**[7]). *Id.* ¶¶ 5, 7, 52–53.

## I. Policy Language

The Federal Policy provides a $10 million limit of liability in excess of the $10 million in underlying coverage issued by five separate insurers, and a $500,000.00 self-insured retention (totaling $10.5 million and defined as Federal's **Underlying**

---

[6]Citations to the Parties' Local Rule 56.1 Statements of Material Facts are identified as follows: "PSOF" for Astella's Statement of Material Facts (R. 116); "Def.'s Resp. PSOF" for Federal's Response to Astella's Statement of Material Facts (R. 128; R. 132); "Pl.'s Resp. DSOAF" for Astella's Response to Federal's Statement of Additional Material Facts (R. 138; R. 142); "Astella's Supplemental Statement of Material Facts (R. 139; R. 143); and "Def.'s Resp. PSOAF" for Federal's Response to Astella's Supplemental Statement of Material Facts (R. 151; R. 153).

[7]Terms in bold have the meanings ascribed from the policy issued by Starr to Astellas, No. SISIFNL20068315 (the **Primary Policy**). R. 115-1, Silversten Decl., Exh. A, Primary Policy. Where necessary, the terms are defined within this Opinion.

**Limit**). Def.'s Resp. PSOF ¶¶ 56–57. Paragraph 1 of the Federal Policy, as amended by Endorsement No. 1, provides, in relevant part, as follows:

> [Federal] shall provide the **Insureds** with insurance during the **Policy Period** excess of the **Underlying Limit**. Coverage hereunder shall attach only after the . . . **Insureds** . . . shall have paid in legal currency the full amount of the **Underlying Limit** for such **Policy Period**. Coverage shall then apply in conformance with the terms and conditions of the **Primary Policy**, except as otherwise provided herein.

*Id.* ¶ 52 (citing R. 115-1, Silversten Decl., Exh. B, Federal Policy at A-67).

The Primary Policy provides coverage for claims brought against Astellas.

Insuring Agreement 1.C. of the Primary Policy states:

> The **Insurer** shall pay on behalf of the **Company** the **Loss** arising from a **Claim** first made during the **Policy Period** . . . against the **Company** for any **Wrongful Act**, and reported to the **Insurer** in accordance with the terms of this policy.

Def.'s Resp. PSOF ¶ 58 (citing Primary Policy at A-23).

The Primary Policy defines **Company** as including "any **Subsidiary** of the **Parent Company**." Def.'s Resp. PSOF ¶ 59 (citing Primary Policy at A-12). **Parent Company** is defined as AUSH. *Id.* ¶ 60 (citing Primary Policy at A-7). The term **Subsidiary** is defined, in relevant part, as "any privately-held for-profit entity . . . of which the **Parent Company** has **Management Control** . . . before the inception of the **Policy Period**." *Id.* ¶ 61 (citing Primary Policy at A-26). "**Management Control**" means, among other things, "owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation." *Id.* ¶ 62 (citing Primary Policy at A-13).

The term **Claim** includes, in relevant part, a "written request to toll or waive the applicable statute of limitations relating to a potential **Claim** against an **Insured** for a **Wrongful Act**." Def.'s Resp. PSOF ¶ 63 (citing Primary Policy at A-24). The term **Wrongful Act** is defined, in relevant part, as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company." *Id.* ¶ 64 (citing Primary Policy at A-27).

Finally, the term **Loss** is defined to include: "damages, settlements or judgments." Def.'s Resp. PSOF ¶ 65 (citing Primary Policy at A-25). It also includes the "multiplied portion of any multiple damage awards . . . but only to the extent that such damages . . . are insurable under the applicable law most favorable to the insurability of such damages." *Id.* (citing Primary Policy at A-25, A-45). **Loss** is defined to exclude "matters which may be deemed uninsurable under applicable law" and "fines and penalties, except as provided for in" the previous sentence. Pl.'s Resp. DSOAF ¶ 1 (citing Primary Policy at A-25). The Primary Policy also explicitly excludes coverage for any **Loss** in connection with any **Claim**:

> (a) arising out of, based upon or attributable to the gaining of any profit or advantage or improper or illegal remuneration if a final non-appealable adjudication in an action or proceeding other than an action or proceeding initiated by the Insurer to determine coverage under the policy establishes that such remuneration was improper or illegal; [and]
>
> (b) arising out of, based upon or attributable to any deliberate fraudulent act or any willful violation of law by an Insured if a final non-appealable adjudication in an action or proceeding other than an action or proceeding initiated by the Insurer to determine coverage under the policy establishes that such act or violation occurred.

(Final Adjudication Exclusions). Def.'s Resp. PSOF ¶ 68 (citing Primary Policy at A-50).

Section 5 of the General Terms & Conditions Section of the Primary Policy, Notice of Claim, provides, in relevant part:

> [I]f during the Policy Period . . . an Insured becomes aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured, the Insured may provide written notice to the Insurer's authorized agent of such circumstances. . . . If a Claim is subsequently made against such Insured and reported to the Insurer arising out of, based upon or attributable to the previously noticed circumstances, such Claim shall be considered first made at the time notice of such circumstances was provided to the Insurer.

Def.'s Resp. PSOF ¶ 66 (citing Primary Policy at A-16).

## II. Xtandi and ARI Funds

In September 2012, Astellas launched Xtandi, a drug used to treat men with metastatic castration-resistant prostate cancer (mCRPC). Def.'s Resp. PSOF ¶ 19. Xtandi differs from other treatments of mCRPC because it works by blocking androgen receptors and is thus classified as an "androgen receptor inhibitor" (ARI). *Id.* ¶ 21. John Liu (Liu), Astella's Executive Director, Reimbursement & Market Access Strategy, led Astella's efforts to ensure that patients could afford Xtandi, including contributing to charity patient assistance programs that provide financial support to patients undergoing cancer treatment. Def.'s Resp. PSOAF ¶¶ 1, 3.

In September 2012 and January 2013, respectively, Astellas began making charitable contributions to patient assistance mCRPC Funds (the mCRPC Funds) run by two separate Charity Patient Assistant Programs (PAPs), the Patient Access Network Foundation (PANF) and the Chronic Disease Fund (CDF) (collectively, the

Charity PAPs). Def.'s Resp. PSOF ¶ 22; Def.'s Resp. PSOAF ¶¶ 4–5. In May 2013, Liu received a press release announcing that PANF had opened a fund for mCRPC patients who were prescribed products with the radioisotope "mechanism of action" (MOA), which caused him to speak to various people at the Charity PAPs about the possibility of setting up another MOA fund, specifically for patients being treat with the ARI for mCRPC (the ARI Funds). *Id.* ¶¶ 7–8. Such funds would include patients who had been prescribed Xtandi and ARI drugs used to treat mCRPC, but would not generally apply to other mCRPC treatments or drugs. Def.'s Resp. PSOF ¶ 24. Astellas, PANF, and CDF each undertook their own independent legal and medical analysis of the ARI Funds. Def.'s Resp. PSOAF ¶ 10. Before Astellas contributed to the ARI Funds, Liu sought approval from Astellas' in-house legal department, who obtained legal advice from regulatory experts and spoke to PANF's and CDF's outside counsel, ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████. *Id.* ¶¶ 11–13. ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████. *Id.* ¶ 11.

After finishing its internal vetting process in June 2013, Astellas began contributing to the PANF and CDF ARI Funds in July 2013, and continued donating to those funds until December 2013 and September 2013, respectively.[8] Def.'s Resp.

---

[8]Astellas stopped donating to the PANF ARI Fund in December 2013, and instead donated to the broader mCRPC Fund previously established by PANF. Def.'s Resp. PSOAF ¶ 16. PANF transferred the remaining money in its ARI Fund into its broader mCRPC Fund. *Id.*

PSOAF ¶¶ 14–16; Def.'s Resp. PSOF ¶¶ 23, 25. Between 2013 and 2016, Astellas paid $116 million into PANF's mCRPC Fund and $12.75 million into CDF's mCRPC Fund. Pl.'s Resp. DSOAF ¶ 2. However, these totals included Astella's payments to the more general mCRPC Funds, and not just the narrower ARI Funds. *Id.* In his April 2017 proffer session with the DOJ, Liu stated that he never had to make a representation to anyone at Astellas regarding any Return on Investment (ROI) on donations to PANF or CDF. Def.'s Resp. PSOAF ¶ 19. He stated that the decision to donate was based on the benefit to patients, but also that "a financial benefit was 'expected or anticipated' from ongoing donations." Gallagher Suppl. Decl. Exh. F at A-456, A-460–61; *see also id.* Exh. E at A-442 ██████████████████████████ ███████████████████████████████████████ When the DOJ asked whether Astellas attempted to "quantify" the potential financial benefit from its donations, Liu said no; that said, he also said he provided [someone at Astellas] data from a data-aggregator that provided general information about the utilization of co-pay assistance foundations. Gallagher Suppl. Decl. Ex. F at A-460, A-464; Def.'s Resp. PSOAF ¶ 19. In the same vein, ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████ Def.'s Resp. PSOAF ¶ 18; Gallagher Suppl. Decl. Exh. E at A-440.

---

Astellas contributed to PANF's mCRPC Fund until March 2016. *Id.* ¶ 17. Astellas made its last donation to CDF in September 2013. *Id.* ¶ 15.

During the period of Astellas' donations to the ARI Funds, Astellas sold Xtandi to distributors and specialty pharmacies, and not to patients, pharmacies, hospitals, or the federal government. Def.'s Resp. PSOAF ¶ 20. Specialty pharmacies filled Xtandi prescriptions, charged the patients the required co-pays based on each patient's insurance plan, and then sought the remainder of the cost from the patient's insurer, including, Medicare. *Id.* ¶ 21. Some patients applied to PANF and CDF for financial assistance, and, based on each charity's independent criteria, PANF and CDF would decide whether to issue a grant to cover all or part of the co-pay obligation for the already prescribed medication. *Id.* ¶ 22.

### III.    DOJ Investigation

In a November 2005 Bulletin (the Bulletin), the OIG advised that copay assistance to Medicare Part D beneficiaries paid by charitable organizations controlled by pharmaceutical manufacturers would also violate the AKS.[9] Def.'s Resp. PSOF ¶¶ 16–17. The Bulletin further advised that donations made by pharmaceutical companies to other 501(c)(3) organizations, not controlled by pharmaceutical manufacturers, risked violating the AKS in certain circumstances. *Id.* ¶ 17. The OIG also issued guidance as to how and under what circumstances pharmaceutical manufacturers could lawfully continue making donations to "bona fide, independent charities unaffiliated with pharmaceutical manufacturers." *Id.* The OIG stressed that independent charity PAPs must decide independently how and under what

---

[9]The Ant-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b, prohibits a pharmaceutical company from offering or paying, directly or indirectly, any remuneration—which includes money or any other thing of value—to induce Medicare beneficiaries to purchase that company's drugs.

circumstances to provide co-pay assistance, as an arrangement where a pharmaceutical company earmarks its contributions to such narrow categories of disease categories that "effectively results in a subsidization of one . . . of the donor's particular products . . . would present an elevated risk of fraud and abuse." *Id.* ¶ 18.

In March 2016, the DOJ issued a Subpoena Duces Tecum to Astellas Pharma, Inc. under 18 U.S.C. § 34862 (HIPAA), demanding certain documents related to the DOJ's investigation (the Subpoena). Def.'s Resp. PSOF ¶¶ 26–27. DOJ agreed to treat the Subpoena as being issued only to Astellas. *Id.* ¶ 29. The Subpoena demanded documents relevant to DOJ's investigation of alleged "Federal healthcare offenses" arising out of Astellas' charitable contributions to the Charity PAPs (the Investigation). *Id.* ¶ 27. "Federal healthcare offenses" is defined in 18 U.S.C. § 24(a) to mean violations of certain enumerated criminal statutes. *Id.*

On March 11, 2016, Astellas gave written notice of the Subpoena to the Insurers (the Original Notice). Def.'s Resp. PSOF ¶ 30. On March 29, 2016, Starr provided its coverage position to Astellas, which stated that Starr refused to treat the Original Notice as a notice of a **Claim**, but it accepted the Original Notice as a notice of "circumstance." *Id.* ¶ 31. *Id.* Federal adopted Starr's position that the Subpoena was only a "circumstance," not a **Claim**. *Id.* ¶ 32.

In September 2017, as part of its ongoing investigation, DOJ issued a Civil Investigative Demand (CID) to Liu. Def.'s Resp. PSOAF ¶ 23. The CID states that it "was issued pursuant to the False Claims Act, 31 U.S.C. § 3729–33, in the course of a False Claims Act investigation" of Astellas to determine whether Astellas had

caused the "submission of false claims to federal government health care programs, in violation of 31 U.S.C. § 3729, by facilitating payments to federal health care beneficiaries." *Id.* ¶ 24.[10]

On October 19, 2017, DOJ requested that Astellas enter into a tolling agreement (the Tolling Agreement), which was executed on October 26, 2017. Def.'s Resp. PSOF ¶¶ 33–34. The Tolling Agreement explained that the DOJ was:

> conducting a joint criminal and civil investigation of [] Astellas . . . . The conduct being investigated includes, without limitation, the possible violation by Astellas . . . of various federal criminal statutes, including, but not limited to, 42 U.S.C. § 1320a-7b (anti-kickback statute) and 18 U.S.C. § 1347 (health care fraud), and certain civil statutes, including, but not limited to, 31 U.S.C. § 3729-33 (False Claims Act) [(FCA)], in connection with Astellas's payments to "501(c)(3)" organizations that provide financial assistance to Medicare beneficiaries.

*Id.* ¶ 34. The Tolling Agreement did not list any state common law theories of liability. *Id.* Astellas reported the Tolling Agreement to Federal (as well as Astellas' other excess Insurers) on November 1, 2017 (the Second Notice). *Id.* ¶ 36. The Second Notice specifically advised the Insurers that the DOJ Tolling Request constituted a Claim. *Id.* ¶¶ 35–36.

Astellas' lead counsel in the DOJ Investigation, Thomas Gallagher (Gallagher), testified that when he received the Subpoena, he knew that the DOJ Investigation "was a serious criminal investigation and assumed it was a parallel civil case as well." Pl.'s Resp. DSOAF ¶ 7. Although the Subpoena and Tolling Agreement list violations

---

[10]Federal disputes the statement of fact to the extent that the CID actually states that it "is issued pursuant to the False Claims Act, 31 U.S.C. § 3729-3733, in the course of a False Claims Act investigation...." Def.'s Resp. PSOAF ¶ 24. However, the CID is attached as an exhibit to the Supplemental Gallagher Declaration, and contains that exact quoted language. *See* Gallagher Suppl. Decl., Exh. H at A-471.

of specific criminal and civil statutes being investigated by the DOJ, Gallagher testified that from his experience, the DOJ "does not investigate or allege statute violations. They allege bad conduct. That's what they're investigating . . . ." *Id.* ¶ 8; *see also* Def.'s Resp. PSOF ¶¶ 27, 34, 37. In this instance, however, Gallagher said that, after receiving the Subpoena, he knew the Government's "main interest was a kickback case," and the only question was whether the DOJ would pursue a criminal case based on the AKS or a civil case based on the FCA with an underlying AKS violation. R. 140, Gallagher Suppl. Decl., Exh. D, Gallagher Dep. Tr. at 23:13–24:22.

As noted above, the alleged "bad conduct" at issue being investigated by the DOJ was, among other things, that Astellas used the Charity PAPs as conduits to funnel impermissible co-pay assistance to Xtandi patients. Def.'s Resp. PSOF ¶ 37; *see also* Pl.'s Resp. DSOAF ¶ 9. Specifically, Gallagher testified that one of the DOJ's theories was that certain pharmaceutical companies, including Astellas, were using charity PAPs to do indirectly what the companies could not do directly—namely, pay others to steer business to federal healthcare programs to increase the companies' own sales. Pl.'s Resp. DSOAF ¶¶ 10–12. In other words, one of the DOJ's theories was that Astellas made charitable donations to the Charity PAPs explicitly to increase sales and revenue for Xtandi at the expense of Medicare. *Id.* Gallagher also testified that, during the investigation, the DOJ was "interested in, among [] other things . . . that Astellas knew that it could increase its price [of Xtandi] to increase revenue because patients would be fully supported by the ARI [F]und[s]." *Id.* ¶ 13.

12

In February 2018, Gallagher and his team gave a presentation to Astellas on the facts of the case, including the DOJ's theories and factual allegations, and to discuss a potential strategy going forward. Pl.'s Resp. DSOAF ¶ 14. ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████ *Id.* ¶ 15. ███████████

████████████████████████████████████████

███████████████████████████████████████ *Id.*

¶ 16. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████ *Id.* ¶ 17; *see also* Def.'s Resp.

PSOF ¶ 25.

After making that presentation to Astellas, Gallagher received authority to "approach the Government about their damages information," particularly "to ask the Government for the numbers." Pl.'s Resp. DSOAF ¶ 18. In April 2018, the DOJ advised Gallagher's team that "their initial view of potential damages for Xtandi based on data in their possession showing the total amount of Medicare reimbursement payments that were made for Xtandi from 2013 to 2016, that they have 'matched' to patients who received copayment support from one of the [Charity PAPs]" totaled ██████████, which the DOJ viewed as "the starting point . . . of the

damages they have incurred." *Id.* ¶¶ 19–20. Gallagher testified that the number, in the Government's view, was "based on tainted donations to the [non-independent] conduits that caused harm to the federal [Medicare program]." *Id.* ¶ 21. The DOJ advised that the Medicare reimbursement amounts represented the starting point of the damages they incurred. *Id.* ¶ 22.

## IV.    DOJ Settlement

Shortly thereafter, in June 2018, the Assistant United States Attorney (AUSA) with day-to-day responsibility for the investigation told Gallagher that she was leaving the DOJ soon and that she was open to engaging in settlement discussions before her departure if Astellas wanted to settle with DOJ in the near future. Def.'s Resp. PSOF ¶ 39.

### A. Settlement Amount



Astellas agreed to engage in settlement discussions,

Def.'s Resp. PSOF ¶ 40; Def.'s Resp. PSOAF ¶ 34.

Def.'s Resp. PSOAF ¶ 35.

Pl.'s Resp. DSOAF

¶ 23; Gallagher Dep. Tr. at 65:11–18. After engaging in settlement discussions, during which the DOJ originally sought a settlement amount of about ████████ Astellas reached an agreement in principle to settle the DOJ's claims on June 29, 2018 for $100 million, plus interest. Pl.'s Resp. DSOAF ¶ 28; Def.'s Resp. PSOF ¶ 45; Def.'s Resp. PSOAF ¶ 37. Federal admits that the settlement was reasonable. Def.'s Resp. PSOF ¶ 49.

Gallagher testified that from his experience, although the DOJ's formal process is to "typically seek[] no less than two times the multiplier of the damages the Government sustained as a result of the alleged FCA violation," the "reality" is that the DOJ takes into account less tangible factors, such as whether "they don't like the way the company's behaved, the company has not cooperated in a way that meets their satisfactions, . . . they're not satisfied with what the parties are fighting about with regard to damages, in other words they think the damages are higher than what the company is willing to admit, [and] solve the problem by applying a higher multiplier[ or c]onversely . . . apply a multiplier of between one and two and also one below one." Def.'s Resp. PSOAF ¶ 36; Pl.'s Resp. DSOAF ¶ 24[11]; Gallagher Dep. Tr. at 54:21–56:11. He went on, "[t]he reality is that they can manipulate any of the numbers, . . . [and] nobody's talking about the multiplier," rather, the settlement agreement does not include the multiplier nor the precise number of damages, and

---

[11]The parties object to each other's statements of fact regarding Gallagher's testimony as to how the DOJ typically calculates settlements for alleged FCA violations and how the final settlement amount was calculated in this case. Def.'s Resp. PSOAF ¶ 36; Pl.'s Resp. DSOAF ¶ 24. Both parties dispute each other's characterizations of Gallagher's testimony and cite back to the deposition testimony underlying the respective statements of fact. *Id.* The Court therefore looks directly to Gallagher's deposition testimony in this paragraph and the next.

the DOJ might "assess damages for a three-year period, but agree to covered conduct that only covers one year for all the collateral consequences that come from a settlement." Gallagher Dep. Tr. at 56:15–57:6.

Consistent with his testimony about the "reality" of how the DOJ typically reaches a settlement amount in civil cases, in this case, "in the end," the DOJ and Astellas put "the formulas aside . . . [to] get to the right number." Pl.'s Resp. DSOAF ¶ 24. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ Gallagher Dep. Tr. at 65:10–68:10. Thus, the DOJ's damages calculations and the period of alleged violative conduct set the stage for the final settlement amount of $100 million plus interest. *See id.*

## B. Settlement Terms

Astellas and the DOJ executed the final written settlement agreement on April 25, 2019 (the Settlement Agreement). Def.'s Resp. PSOF ¶ 46. The same day, the DOJ issued a press release about its settlement with Astellas and another pharmaceutical company, stating, "As today's settlements make clear, the FBI will aggressively go after pharmaceutical companies that look to bolster their drug prices by paying illegal kickbacks — whether directly or indirectly — to undermine taxpayer funded healthcare programs, including Medicare[.]").Pl.'s Resp. DSOAF ¶ 30.

The Settlement Agreement states that Astellas is to pay to the United States $100 million, plus interest, and that "[o]f the Settlement Amount, $50 million is restitution to the United States." Pl.'s Resp. DSOAF ¶ 28. The phrase "restitution to the United States" is part of DOJ's most recent standard-form release used in FCA settlements. Def.'s Resp. PSOAF ¶ 38; Gallagher Dep. Tr. at 29:5–30:3. Under 26 U.S.C. § 162(f), as amended by the Tax Cuts and Jobs Act of 2017 (the TCJA), an amount paid in settlement to the government is not tax deductible unless (and only to the extent that) it constitutes "restitution . . . for damage or harm . . . caused by the . . . potential violation of law" and is identified in the settlement agreement as "restitution." The DOJ rejected Gallagher's suggestion to reference 26 U.S.C. § 162(f) in the Settlement Agreement. Pl.'s Resp. DSOAF ¶¶ 26–27.

Section E of the Settlement Agreement sets forth the "Covered Conduct," in which the DOJ asserts that, between July 1, 2013 and December 31, 2014, Astellas used CDF and PANF as conduits to funnel impermissible co-pay assistance to Xtandi patients, thereby causing Medicare beneficiaries to submit false claims for reimbursement to Medicare. Def.'s Resp. PSOF ¶ 46. Astellas did not admit these allegations or liability. *Id.* Paragraph 2 of the Settlement Agreement sets forth the DOJ's release of Astellas pursuant to the Settlement, which releases Astellas "from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-33, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Remedies Act, 31 U.S.C. §§ 3801-12, or the common law theories of payment by mistake, unjust enrichment,

and fraud." Pl.'s Resp. DSOAF ¶ 29. The DOJ never agreed to settle or release any criminal claims against Astellas, and it declined to provide a "cold comfort" letter ███████████████████████. Def.'s Resp. PSOAF ¶ 39.

Astellas paid the full amount of the settlement, $102,370,890.41 (Settlement Payment), on April 25, 2019. Def.'s Resp. PSOF ¶ 48. Astellas then demanded that Federal reimburse it for $10 million of the Settlement Payment, the full amount of the Federal Policy limit. *Id.* ¶ 50. Federal has denied coverage for any portion of the Settlement Payment. *Id.* ¶ 51.

## Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh

conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

## Analysis

## I.     Procedural Motions

Before turning to the substance of the Parties' cross-motions for summary judgment, the Court must address two motions addressing the facts and law it can consider as part of its analysis of the summary judgment motions.

### A. Astellas' Motion to Deem Admitted its Statement of Additional Facts

As a preliminary matter, Astellas moves to deem admitted many of the facts submitted as part of its Local Rule 56.1(b)(3)(C) statement of additional material facts in support of its opposition to Federal's cross-motion for summary judgment. R. 155, Pl.'s Mot. Admit. Federal objects to Astellas' motion as a "thinly veiled attempt to get in the 'last word' with respect to the parties' cross-motions for summary judgment and provide a reply to Federal's responses to [Astellas' statement of additional material facts]." R. 157, Def.'s Resp. Admit at 1. The Court agrees with Federal that portions of Astellas' motion read as such, in particular the footnote discussing the "disparaging rhetoric" in Federal's Reply. *Id.* at 1–2. Such arguments are inappropriate for a motion to deem admitted statements of material fact, and the Court disregards any language from either party that does not strictly relate to the

admissibility of statements of material fact. *See, e.g.*, *Barth v. Vill. of Mokena*, 2006 WL 862673, at *3 (N.D. Ill. Mar. 31, 2006).

Moreover, Federal correctly points out that, like other courts in this District, the Court "is well aware of what it may consider on summary judgment," and "is capable of disregarding unfounded assertions of fact found in [parties' statements or denials] . . . ." Def.'s Resp. Admit at 2 (citing *Bone Care Int'l, LLC v. Pentech Pharms., Inc.*, 2012 WL 1068506, at *1 (N.D. Ill. Mar. 29, 2012); *U.S. S.E.C. v. Berrettini*, 2012 WL 5557993, at *1 (N.D. Ill. Nov. 15, 2012)). However, unlike Judge Dow, who issued the decisions in *Bone Care* and *Berrettini*, at the time Astellas filed its motion to deem admitted its statement of additional facts, this Court's webpage did not indicate that motions to strike Local Rule 56.1 statements are disfavored. True, such an omission does not change the Court's ability to determine which facts are admissible under Local Rule 56.1 without considering a motion to admit or strike; however, as the Parties fully briefed Astellas' motion to admit, the Court briefly considers some of their arguments, while deferring the rest for reviewing as necessary as part of its analysis of the Parties' summary judgment motions.

When "a party moves for summary judgment in the Northern District of Illinois, it must submit a memorandum of law, a short statement of undisputed material facts [(L.R. 56.1 Statement)], and copies of documents (and other materials) that demonstrate the existence of those facts." *ABC Acquisition Co., LLC v. AIP Prod. Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing N.D. Ill. Local R. 56.1(a)). The L.R. 56.1 statement must cite to specific pages or paragraphs of the

documents and materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004)). Under Local Rule 56.1(b)(3), the nonmovant must counter with a response to the separate statement of facts, and either admit each fact, or, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. Local R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. Local R. 56.1(b)(3)(C). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.*; *see also Daniels v. Janca*, 2019 WL 2772525, at *1–2 (N.D. Ill. July 2, 2019). Similarly, "[i]f additional material facts are submitted by the opposing party . . ., the moving party may submit a concise reply in the form prescribed in that section for a response." N.D. Ill. Local R 56.1(a). If the movant fails to respond properly to the opposing party's statement of additional facts, those facts will be deemed admitted. *Id.* District courts have discretion to enforce strict compliance with Local Rule 56.1's requirements. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219

(7th Cir. 2015); *see also Hanover Ins. Co. v. House Call Physicians of Ill.*, 2016 WL 1588507, at *2 (N.D. Ill. Apr. 19, 2016) (collecting cases).

### 1. Statements Supported by the Supplemental Declaration of Thomas Gallagher

Astellas asks the Court to admit twelve of its statements of additional facts, all of which are supported by the sworn Supplemental Declaration from Thomas Gallagher, Astellas' lead counsel in its defense of the DOJ investigation, and which Astellas argues are not controverted by Federal. *Id.* at 3–4 (citing Def.'s Resp. PSOAF ¶¶ 1, 2, 6, 8–10, 12–13, 20–22, 27). In its responses to each of the at-issue statements of additional fact, Federal states, "Gallagher's supplemental declaration speaks for itself. However, none of the documents or testimony attached to Gallagher's declaration specifically include this alleged material fact." Def.'s Resp. PSOAF ¶¶ 1, 2, 6, 8–10, 12–13, 20–22, 27. The Court agrees with Astellas that "[s]aying that a document 'speaks for itself' is not a denial under Local Rule 56.1(b)(3)(B)." Pl.'s Mot. Admit at 4 (quoting *Henderson v. Bovis Lend Lease, Inc.*, 848 F. Supp. 2d 847, 849 (N.D. Ill. 2012) (collecting cases)). That the statements of additional fact are not specifically supported by attached documents or deposition testimony matters not— it is well-settled that a sworn declaration is sufficient to defeat summary judgment so long as it is based on personal knowledge and it is non-conclusory. Pl.'s Mot. Admit at 5; *see Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (evidence presented in a

"self-serving" affidavit or deposition is enough to thwart a summary judgment motion provided it meets the usual requirements for evidence at summary judgment stage).

A review of the facts supported by Gallagher's deposition demonstrates that they are supported by his first-hand knowledge of the facts and evidence developed during the course of his defense of the DOJ investigation. Def.'s Resp. PSOAF ¶¶ 1, 2, 6, 8–10, 12–13, 20–22, 27. Therefore, since the foregoing statements of additional fact are properly supported by specific evidence (Gallagher's Supplemental Declaration) as required by Local Rule 56.1(a), and Federal fails to deny each fact and dispute each fact with "specific references to the affidavits, parts of the record, and other supporting materials relied upon," as required under Local Rule 56.1(b)(3), the Court grants Astellas' motion to admit their statements of additional fact numbers 1, 2, 6, 8–10, 12–13, 20–22, 27. *See Curtis*, 807 F.3d at 218–19 (affirming district court's discretion in deeming facts admitted where opposing party "failed to admit or deny facts and provided only boilerplate objections, such as 'relevance' . . . [and m]ost importantly, . . . failed to provide citation to any admissible evidence in support of his denials" in violation of Local Rule 56.1(b)(3)(B)); *see also Daniels*, 2019 WL 2772525, at *1–2 (N.D. Ill. July 2, 2019) (collecting Seventh Circuit cases affirming district courts' discretion to deem statements admitted when nonmovant fails to comply with Local Rule 56.1(b)(3)(B)). Because these facts are submitted in

opposition to Federal's cross-motion for summary judgment, the Court views the facts in the light most favorable to Federal, and all inferences will be drawn in its favor.

Relatedly, although not raised by Federal, the Court notes that, given the Supplemental Declaration was submitted to support Astellas' opposition to Federal's cross-motion for summary judgment, the Court will consider it only for that purpose; it will *not* consider the Supplemental Declaration or additional facts to the extent they support Astellas' *own* summary judgment motion. *See Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 968 (7th Cir. 2020) (courts should not "deny a party a chance to respond to new arguments or facts raised for the first time in a reply brief in support of a motion for summary judgment"); *ABC Acquisition Co., LLC v. AIP Prod. Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) ("Every time that a party submitted new factual material in support of their reply briefing, the exhibits submitted were disregarded.") (internal citations omitted).

Of course, as Federal accurately states, Local Rule 56.1 applies to both parties; therefore, to the extent technical rule violations are present in Astellas' statements of fact or responses to Federal's statements of fact, the Court evaluates them in the same way. Def.'s Resp. Admit at 2 (citing *Maher v. Rowen Grp., Inc.*, 2015 WL 273315, at *7 (N.D. Ill. Jan. 20, 2015)). As noted above, to the extent such a violation results in the admissibility or inadmissibility of a fact material to the Court's analysis, the Court so notes it in its discussion of the cross-summary judgment motions. However, because Federal specifically asks this Court to deem admitted its statements of additional fact numbers 8, 11, 12, 13, 18, 21, 23, and 24 because Astellas disputed

those statements based on the underlying declaration "speak[ing] for itself," the Court briefly addresses that argument. *Id.* at 9–10 (citing Pl.'s Resp. DSOAF ¶¶ 8, 11, 12, 13, 18, 21, 23, 24).

True, simply stating that a document "speaks for itself" is not, on its own, a denial to a statement of fact. *See Henderson*, 848 F. Supp. 2d at 849. But as Astellas points out in its reply in support of its motion to admit, each of Federal's statements of additional fact to which Astellas responded by stating that "Gallagher's testimony speaks for itself" *also* contains a specific admission or denial about the information contained in Federal's statement of additional fact, including a citation to specific evidence. R. 158, Pl.'s Reply Admit; Pl.'s Resp. DSOAF ¶¶ 8, 11, 12, 13, 18, 21, 23, 24. Therefore, the Court does not deem each of Federal's foregoing statements of additional fact to be admitted; however, to the extent the Court relies on them in its analysis of the Parties' cross-motions for summary judgment, it evaluates whether the statements of fact and responses thereto are supported by specific record evidence, and considers them accordingly.

### 2. Other Disputed Statements

Astellas also asks the Court to deem admitted another seven of Astellas' statements of additional fact, which it claims Federal fails to properly dispute. The Court briefly addresses the Parties' arguments below.

### a. Paragraph 3

The Parties engage in lengthy argument about whether Federal properly disputed Paragraph 3. Pl.'s Mot. Admit at 12; Def.'s Resp. Admit at 3–4. In support

of Paragraph 3, Astellas cited to Gallagher's supplemental deposition, which supports the statement, and mistakenly cited to a portion of Gallaher's deposition testimony, which does not support the statement. Def.'s Resp. PSOAF ¶ 3. Despite the Parties' arguments about whether Federal "should have known" that the citation to the deposition testimony was a mistake, it matters not: Gallagher's Supplemental Declaration supports the statement, and Federal fails point to any evidence to the contrary. For the same reasons as above, *see Supra* Section I.A, Paragraph 3 is deemed admitted.

### b. Paragraph 14

Astellas argues that the Court should deem Paragraph 14 admitted because Federal's denial is inconsistent with its previous admissions. Pl.'s Mot. Admit at 6–7. At issue is when Astellas began donating to the ARI Funds. Paragraph 14 states that Astellas began contributing to the ARI Funds after finishing its internal vetting process in June 2013, and relies on Gallagher's Supplemental Declaration, as well as Exhibit G thereto, a spreadsheet showing "Foundation Donations." PSOAF ¶ 14. Federal disputes the date of the first payment, as Exhibit G shows a payment as early as September 2012 (as well as payments in January through April of 2013, which Federal does not point out). Pl.'s Mot. Admit at 6 (citing Def.'s Resp. PSOAF ¶ 14). In its motion to admit, Astellas argues that Federal's denial is inconsistent with its admissions to other statements of fact and statements of additional fact, which demonstrate that Astellas donated to mCRPC Funds as early as September 2012, but that the ARI Funds were not created until mid-2013. *Id.* at 6–7 (citing Def.'s Resp.

PSOAF ¶ 7); *see also* Def.'s Resp. PSOF ¶¶ 22–25 (Federal disputed whether the PANF and CDF Funds were "independent" but admitted that Astellas made contributions to the PANF and CDF Funds beginning in 2012 and began making donations to the ARI Funds after their creation in July 2013). Although the Court agrees with Federal that Exhibit G to Gallagher's Supplemental Declaration, on its own, is not clear about whether the donations were made to the mCRPC Funds or the ARI Funds specifically, sufficient other evidence supports the fact that Astellas did not begin making payments to the ARI Funds until June (or July) 2013. Given that Federal admitted as much in response to other statements of fact and statements of additional fact, and does not point to evidence that *contradicts* that fact, the Court deems Paragraph 14 admitted.

### c. Paragraphs 18, 19, 25, 30, 36, 38

Finally, Astellas moves to admit Paragraphs 18, 19, 25, 30, 36, and 38 because Federal does not properly dispute the statements, but rather improperly engages in argument in violation of Local Rule 56.1. Pl.'s Mot. Admit at 7–11. Astellas is correct that "[l]egal arguments do not go in the separate statements of fact." *ABC Acquisition*, 2020 WL 4607247, at *7 (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[i]t is inappropriate to make legal arguments in a Rule 56.1 statement of facts"); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1017–18 (N.D. Ill. 2018)). True, some of the identified responses to Astellas' statements of additional facts include legal arguments, as well as arguments about what inferences should be drawn from facts. But so too do some of Astellas' Local Rule

56.1 statements and responses. The Court will not consider the portions of the parties' Local Rule 56.1 submissions that make legal arguments and assert legal conclusions. *See Rivera*, 319 F. Supp. 3d at 1018 (collecting cases disregarding or affirming the decision to disregard argumentative statements of fact). But the Court declines to strike the noncompliant paragraphs, or wholesale admit statements of fact that are disputed in part by argument, "as doing so would in some cases throw out a properly supported assertion along with a legal argument or conclusion." *Id.* Rather, the Court will consider the properly supported factual assertion or response but disregard the portion of any factual statement or response that contains legal arguments or conclusions. *See id.* (citing *Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012) (denying motion to strike portions of Local Rule 56.1 statements containing legal conclusions but disregarding conclusions); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771–72 (N.D. Ill. 2012) (same)). Where any such facts are material to the Court's analysis, the Court notes them within this Opinion.

### B. Astellas' Motion for Leave to File Supplemental Authority

Also pending before the Court is Astellas' motion for leave to file as supplemental authority a decision of the Delaware Supreme Court, *RSUI Indemnity Co. v. Murdock*, 2021 WL 803867 (Del. Mar. 3, 2021), which was decided after briefing on the parties' cross-motions for summary judgment had concluded. R. 159, Pl.'s Mot. Suppl. Auth. Astellas argues that *Murdock* is persuasive, because although it is decided under Delaware law, "the decision is rooted in fundamental and widely-

28

accepted concepts" that are also recognized under Illinois law regarding "whether the settlement of claims involving unproven allegations of fraud are insurable under D&O insurance policies," a point at issue in this case *Id.* ¶¶ 8–10. Federal opposes the motion, arguing that *Murdock* is non-precedential and factually and legally distinguishable. R. 161, Def.'s Resp. Suppl. Auth. ¶ 1. The Court grants Astellas' motion and will consider *Murdock* in its analysis of the parties' cross-motions for summary judgment, as the Court agrees with Astellas that *Murdock* is at least somewhat helpful as to the analysis about the insurability of settlements alleging fraud. *See, e.g.*, *Jacobs, Jr. v. Guardian Life Ins. Co. of Am.*, 730 F. Supp. 2d 830, 844 (N.D. Ill. 2010) (granting motion for leave to file supplemental authority that was "helpful with respect to" a point at issue in the case). The Court will consider the Parties' arguments about *Murdock*'s applicability in its analysis and give the decision the due weight warranted by its jurisdiction and facts.

## II.    Cross-Motions for Summary Judgment

Turning to the substantive summary judgment motions, the heart of the Parties' dispute is whether Federal is obligated to reimburse Astellas $10 million of the Settlement Payment pursuant to the Federal Policy.

As an initial matter, the Parties agree that Illinois law governs the coverage dispute in this case because the policies were issued in Illinois, covering an Illinois insured. R. 115, Pl.'s Memo. at 10 (citing *Hofeld v. Nationwide Life Ins. Co.*, 322 N.E.2d 454, 458 (Ill. 1975); R. 130, Def.'s Cx-Memo./Resp. at 9 (citing *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995)). The standard rules

of contract construction apply to insurance policies—the "primary objective is to ascertain and give effect to the intent of the parties of the contract . . . if the language of the policy is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured." *Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 491–92 (Ill. 2001) (internal citations omitted). However, a policy provision is not ambiguous solely because the parties disagree about its interpretation. *Founders Ins. Co., v. Munoz*, 930 N.E. 2d 999, 1004 (Ill. 2010).

The parties also agree that, under Illinois law, the insured bears the initial burden of demonstrating the existence of a claim that falls within the coverage provided by the policy. *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009); *Miner v. Bray*, 513 N.E.2d 580, 582 (Ill. App. Ct. 1987). If the insured establishes that its claim is covered by the policy, the burden shifts to the insurer to demonstrate that any exclusion upon which it relies clearly and unequivocally excludes coverage. *St. Michael's Orthodox Cath. Church v. Preferred Risk Mut. Ins. Co.*, 496 N.E.2d 1176, 1178 (Ill. App. Ct. 1986); *Strzelczyk v. State Farm Mut. Auto. Ins. Co.*, 485 N.E.2d 1230, 1233 (Ill. App. Ct. 1985), *aff'd*, 497 N.E.2d 1170 (Ill. 1986); *see also State Farm Fire & Cas. Co. v. Moore*, 430 N.E.2d 641, 646 (Ill. App. Ct. 1981) ("[T]he insurer, as the drafter of the policy, could have stated exclusions clearly and specifically . . . . Exclusionary provisions, therefore, are applied only where the terms are clear, definite and explicit.") (internal citations omitted). "Conditions, exclusions, or exceptions to coverage in an insurance police are to be strictly construed against the

insurer." *Erie Ins. Exch. v. Kennedy*, 2020 WL 7079237, at *6 (Ill. App. Ct. Dec. 3, 2020) (citing *Mitchell Buick & Oldsmobile Sales, Inc. v. Nat'l Dealer Servs., Inc.*, 485 N.E.2d 1281, 1287 (Ill. App. Ct. 1985)).

## A. Coverage Under the Federal Policy

Astellas argues that the Court should grant summary judgment in its favor, finding that it satisfied the requirements for coverage under the Federal Policy, including that at least $50,185,445[12] of its settlement payment (Settlement Payment) to the DOJ constitutes a Loss as defined by the Primary Policy, and no exclusions apply. Pl.'s Memo at 2–3, 15–18. Federal counters that the Court must deny Astellas' motion and grant Federal's motion, as the Settlement Payment does not constitute a **Loss** under the Primary Policy, as the definition of **Loss** excludes "matters which may be deemed uninsurable under applicable law" and coverage is prohibited by public policy. Def.'s Cx-Memo./Resp. at 9–20.

### 1. Undisputed Prerequisites for Coverage

Federal does not dispute most of the prerequisites for coverage under the Federal Policy, specifically that: (1) Astellas meets the definition of **Company**; (2) the DOJ Tolling Request is a **Claim**, which was made during the **Policy Period**

---

[12]As noted above, *see supra* Background Section IV.B, the full Settlement Payment Astellas paid to the DOJ was $102,370,890.41, which constitutes a 2x multiplied damages under the FCA. Pl.'s Memo. at 3. Federal argues that "[s]uch amounts under the FCA are considered punitive in nature" and thus are not insurable under Illinois law. Def.'s Cx-Memo./Resp. at 9 n.3. Astellas argues that multiplied damages awards are not against public policy, and disputes that damages under the FCA are "punitive", R. 144., Pl.'s Reply/Cx-Resp. at 19–20, 23 n.14, and points out that the definition of **Loss** expressly includes "settlements" and "the multiplied portion of any multiple damages award," *id.* at 8–9. The Court need not decide the dispute, because even the lower amount, $50,185,445, does not exceed Federal's Underlying Limit or Federal's $10 million limit of liability.

based on the Original Notice; (3) that the DOJ alleged a **Wrongful Act**; and (4) Astellas reported the **Loss** to Federal in accordance with the terms of the Policy. *See* Def.'s Cx-Memo./Resp. at 3 n.2. Although Federal states that its concession is "for purposes of this [summary judgment] motion only," *id.*, the Court agrees with Astellas that the undisputed facts support each of these prerequisites as well. Pl.'s Memo. at 13–15; *see* Def.'s Resp. PSOF ¶¶ 2–4, 59–62 (undisputed that Astellas is a Subsidiary of the Parent Company because the Parent Company (AUSH) owns 100% of Astella's common stock and had the right to select Astellas' directors and therefore had management control over Astellas, and the Primary Policy defines Company as including Subsidiaries); *id.* ¶¶ 31–32, 34, 63, 66 (undisputed that Federal accepted the Original Notice as a notice of circumstances, which was provided during the **Policy Period**, and that the Tolling Request was related to the Original Notice and requested that Astellas enter into an agreement to toll the applicable statute of limitations, which satisfies the definition of a **Claim** and the requisite **Notice of Claim**); *id.* ¶¶ 46, 64 (undisputed that the DOJ asserts in the Settlement Agreement that Astellas' donations to the Charity PAPs violated federal law by causing false claims to be submitted to Medicare for Xtandi prescriptions, and therefore meets the Primary Policy's definition of Wrongful Act, "any actual or alleged breach of duty,

neglect, error, misstatement, misleading statement, omission or act by the Company").

## 2. Settlement Payment as a Covered Loss

As noted above, the crux of the Parties' dispute is whether the Settlement Payment constitutes a **Loss** under the Primary Policy, and specifically whether it falls within the "uninsurable under applicable law" exception to the definition of **Loss**. To resolve this dispute, the Court must determine whether the Settlement Payment constitutes damages or restitution.

At the outset, the Court must determine which party bears the burden of establishing whether the Settlement Payment was a "covered loss" under the Federal Policy. Federal asserts that "Astellas cannot meet its burden of proof that at least $51,185,445 of the Settlement [Payment] was to settle Loss covered under the Federal Policy." Def.'s Cx-Memo./Resp. at 9. And Astellas, on the other hand, asserts that "Federal cannot bear its burden to prove that the settlement payment 'clearly and unequivocally' constitutes uninsurable disgorgement" and thus is outside the definition of **Loss**. Pl.'s Br. at 18. Although both parties cite the applicable Illinois law on the insured's initial burden serving as a prerequisite for an insurer's burden of establishing an exclusion, neither party addresses how the law applies to an exclusion *within* a definition of Loss in the policy.

The Court finds that the language is an exclusion notwithstanding the fact that it is located in the section defining "Loss" rather than in the "Exclusions" section of the Primary Policy. The location of language within an insurance contract does not

necessarily control which party bears the burden of proof on that provision. *Rutgens Distribs., Inc. v. U. S. Fid. & Guar. Co.*, 419 N.E.2d 59, 63 (Ill. App. Ct. 1981). The court in *Rutgens* stated that "whether an insurer attempts to avoid policy coverage by relying upon an express policy exclusion, or by relying upon a clause which limits coverage through a narrow definition of the insured or the risk insured against, the ultimate same result is accomplished." *Id.* The location of the exclusion at issue within the definition of "Loss" is not dispositive, and the Court finds that it is an exclusion whereby Federal attempts to avoid policy coverage. *See, e.g.*, *Mierzycki v. Am. Fam. Mut. Ins.*, 2014 WL 3827673, at *4 (Ill. App. Ct. Aug. 4, 2014); *Gallup, Inc. v. Greenwich Ins. Co.*, 2015 WL 1201518, at *4–5, 10 (Del. Super. Ct. Feb. 25, 2015). Therefore, Federal, as the insurer, bears the burden of establishing that the exception applies. *Strzelczyk*, 485 N.E.2d at 1233; *see also Erie Ins. Exch.*, 2020 WL 7079237, at *6. The Court then must determine whether Federal has met that burden, specifically whether the Settlement Agreement allows for disgorgement of ill-gotten gains by Astellas.

It is not disputed that, under Illinois law, disgorgement of ill-gotten gains is uninsurable; an insured who is merely returning funds to which it was never entitled cannot recover from an insurer the repayment of those funds. Pl.'s Memo. at 15 & n.13; Def.'s Cx-Memo./Resp. at 10 (citing, among other cases, *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001); *Loc. 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.*, 735 N.E.2d 679, 684 (Ill. App. Ct. 2000); *St. Paul Mercury Ins. Co. v. Foster*, 268 F. Supp. 2d 1035, 1044 (C.D. Ill.

2003)). However, the Parties dispute whether the Settlement Payment constituted a damages payment to compensate the Government for a loss or injury done to it, as Astellas advocates, or, instead, was intended to divest Astellas of the net benefit it received as a result of its alleged wrongdoing, as Federal argues. Illinois law recognizes a distinction between the legal remedy of "damages" and the "restitution" of unjust gains. *Raintree Homes, Inc. v. Vill. of Long Grove*, 807 N.E.2d 439, 445 (Ill. 2004) ("Damages differs from restitution in that damages is measured by the plaintiff's loss; restitution is measured by the defendant's unjust gain.") (internal citation omitted).

### a. Classification of Settlement Payment

The Settlement Agreement designates $50 million of the Settlement Payment as "restitution to the United States." Pl.'s Resp. DSOAF ¶ 28. Federal contends that such a label is persuasive evidence that the Settlement Payment was in fact restitution paid to the Government to account for Astellas' unjust gains. Def.'s Cx-Memo./Resp. at 12–13; Def.'s Cx-Reply at 3–4. Astellas retorts that the "label" is unimportant for two reasons. First, the definition of "restitution" encompasses both disgorgement *and* compensation. Pl.'s Br. at 18 n.16 (citing Restitution, Black's Law Dictionary (11th ed. 2019) ("Restitution" can "sometimes refer to the disgorging of something which has been taken"; but, it can also refer to "compensation for injury done.")). Astellas argues that it is clear in the context of the Settlement Agreement that "restitution" means compensation for loss or injury to the Government. Pl.'s Reply/Cx-Resp. at 10. Federal does not dispute this definition.

Second, and more importantly, Astellas argues that the undisputed evidence establishes that the purpose in labeling a portion of the Settlement Payment as "restitution to the United States" was to identify the tax-deductible portion of the settlement as required under 26 U.S.C. § 162(f). Pl.'s Reply/Cx-Resp. at 10. Federal contends that, "although Gallagher testified that compliance with the TCJA was *a* reason that the Settlement Payment was labelled as 'restitution,' there is no testimony that this was the *sole* reason that it was labelled as such." R. 150, Def.'s Cx-Reply (Sealed) at 3 (emphasis in original). Moreover, Federal notes that Astella's argument is undermined by the fact that the Government rejected Astellas' attempt to include language in the Settlement Agreement clarifying that the purpose for identifying $50 million as "restitution" was to comply with the TCJA. *Id.*

However, the Court finds neither of Federal's arguments persuasive, as the undisputed evidence undermines both. First, Gallagher's Supplemental Declaration states that the lead AUSA "informed [him] during settlement negotiations that *the* purpose of identifying $50 million as restitution to the United States was to comply with the [TCJA]."[13] Gallagher Suppl. Decl. ¶ 17 (emphasis added); Def.'s Resp. PSOAF ¶ 38. Federal has provided no evidence that the language was inserted into the Settlement Agreement for any other purpose. Second, Gallagher explained the Government's refusal to include explanatory language was due to its "long-standing policy against modifying form settlement agreements." Pl.'s Resp. DSOAF ¶ 27. Again, Federal has not offered any evidence contradicting Gallagher's explanation.

---

[13]There were no objections raised by the Parties to the admissibility of evidence considered by the Court in this Opinion, other than as specifically noted in this Opinion.

Therefore, based on the record before the Court, that part of the Settlement Payment that is labeled as "restitution" in the Settlement Agreement does not support a finding that the Government sought to disgorge profits from Astellas.

### b. Damages Allowed Under the FCA

Astellas focuses much of its argument on the damages permitted under the FCA. Pl.'s Br. at 15–18; Pl.'s Reply/Cx-Resp. at 10–16. Federal argues that this is too narrow a view of whether the Settlement Payment is insurable, as "it is not Federal's argument that coverage is not available simply because the Settlement Payment was in some way a disgorgement of Astellas' profits, but rather that the intent of the Settlement Payment was to deprive Astellas of the net benefit of its wrongful acts." Def's Cx-Reply at 10. But the Court finds that an analysis of the damages allowed under and the purpose of the FCA to be helpful to set the stage.

The FCA imposes liability on "any person who—(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). A "claim" for purposes of the FCA includes not only direct requests to the government for payment but also reimbursement requests made by the recipients of federal funds under federal benefits programs, such as Medicare. *Universal Health Servs., Inc. v. U.S.*, 136 S. Ct. 1989, 1996 (2016). Further, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). Section 3729(a) of the FCA provides for two kinds of relief: civil penalties and "3 times the amount of damages which the government sustains because of the act of that person." 31 U.S.C. § 3729(a).

37

As discussed above, the DOJ alleged that Astellas violated the AKS by making improper donations to the Charity PAPs, which caused Medicare beneficiaries to present false claims to Medicare for reimbursement. The Seventh Circuit has explained that, through Medicare, the government "offers a subsidy . . . with conditions," and those conditions include compliance with the AKS. *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008). And "[w]hen the conditions are not satisfied" because of a violation of the AKS, "nothing is due." *Id.* So, when the Government alleges an FCA violation based on an underlying violation of the AKS, it claims that it was damaged to the full extent of the reimbursements it provided to Medicare beneficiaries. *Id.*

Astellas argues that the plain text of the statute, 31 U.S.C. § 3729, which provides for payment of *damages* sustained by the Government, as well as FCA jurisprudence, establishes that any payment for a violation of the FCA is for *compensation* for the harm to the Government rather than *restitution* for the gain to the violator. Pl.'s Br. at 12–13 (citing *U.S. ex rel. Taylor v. Gabelli,* 2005 WL 2978921, at *7 (S.D.N.Y. Nov. 4, 2005); *U.S. ex rel. Rosales v. S.F. Hous. Auth.*, 173 F. Supp. 2d 987, 1013 (N.D. Cal. 2001); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010)). Relying primarily on *Taylor*, Astellas contends that "the FCA does not permit the government to pursue the equitable remedy of disgorgement or the restitution of ill-gotten gains." *Id.* at 13 (citing *Taylor*, 2005 WL 2978921, at *7). According to Astellas, under the FCA's damages calculation, it matters not whether Astellas profited from its donations to the Charity PAPs—even if Astellas

sold Xtandi for a loss, the Government's damages claim would have been the same, as its damages "were measured exclusively by what the government paid to third parties—not by Astellas's unjust profits, if any, from those sales." *Id.* at 16–17.

On the other hand, Federal contends that the FCA was enacted specifically to provide "restitutionary relief to the government for money taken from it by fraud." Def.'s Cx-Memo./Resp. at 10–11 (citing, among other cases, *United States v. Bornstein*, 423 U.S. 303, 314 (1976) (quoting *United States v. Hess*, 317 U.S. 537, 551–52 (1943)); *U.S. ex rel. McCandliss v. Sekendur*, 282 F. App'x 439, 442 (7th Cir. 2008); *In re Spielman*, 588 B.R. 198, 208 (Bankr. N.D. Ill. 2018)). True, the cases cited by Federal all state in nearly identical language, that the FCA provides "restitution to the government of money taken from it by fraud." *See Bornstein*, 423 U.S. at 314. But upon a closer reading of these cases, the Court agrees with Astellas that, although they use the word "restitution," they nonetheless all stand for the proposition that damages under the FCA are meant to "compensate the United States" to make it "completely whole." Pl.'s Reply/Cx-Resp. (citing *Bornstein*, 423 U.S. at 314).

Although it is only persuasive, not binding, authority, Court finds the reasoning in *Taylor* to be thorough and sound: it engages in a lengthy analysis of the FCA's damages provision, including statutory interpretation, an examination of the FCA jurisprudence and legislative history, all of which "leave no doubt that the FCA's remedial framework does not extend[] beyond 'make-whole' damages to include 'disgorgement of unjust enrichment' restitution." *Taylor*, 2005 WL 2978921, at *6–13; *see also U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 732 (N.D.

Ill. 2007) ("Disgorgement of profits is not a remedy recoverable under the FCA.") (citing *Taylor*, 2005 WL 2978921).[14]

Federal attempts to distinguish *Taylor*, noting that it discussed relief available only to a *relator*, not to the Government. Def.'s Cx-Memo./Resp. at 14. But this argument is unavailing; although the plaintiff in *Taylor* was a relator, the court discussed the FCA's remedial provision generally, including the relief available to relators *and* the Government. *Taylor*, 2005 WL 2978921, at *6–13. In noting that the opinion focused on the remedies available to the relator only, and that "[t]he remedies available generally to the Government present an entirely different question," the court stated that the Government could bring a suit alleging claims that provide for disgorgement of unjust profit, such as unjust enrichment. *Id.* at 13. A relator is limited to the remedies available under the FCA (damages), which provides for *qui tam* suits, unlike other statutes and common law causes of action that allow the Government to seek restitution.

The Court agrees with Astellas that the FCA allows only for civil penalties and compensatory damages, not for restitution in the form of disgorgement of the violator's unjust gains.

### c. Intent of the Settlement Agreement

Federal argues that, no matter how it is labeled, "the intention of the Settlement Payment was to divest Astellas of the net benefit of its unlawful scheme

---

[14]Federal also attempts to distinguish *Tyson* because it is a case brought by a relator rather than the Government, but for the reasons discussed below as it pertains to *Taylor*, the Court finds this argument unavailing.

as a result of its perpetrating a fraud upon the government" and therefore is uninsurable under Illinois law. Def.'s Cx-Reply at 3. In support, Federal points to a variety of evidence that it argues demonstrates the Government's goal of the Investigation and settlement, as well as Astellas' fraudulent intent behind the ARI Funds. *Id.* at 6–7 (citing Pl.'s Resp. DSOAF ¶ 30 (DOJ's Press Release about the settlement stating that DOJ's enforcement actions, such as the action against Astellas, "make clear that the government will hold accountable drug companies that directly or indirectly pay illegal kickbacks"); *id.* ¶ 17 (the price of Xtandi increased while Astellas was contributing to the ARI Funds); Def.'s Resp. PSOAF ¶ 18 (two of the DOJ's investigation themes were that Astellas knew out-of-pocket costs would be a problem but co-pay assistance foundations "solved the problem" and allowed the price of Xtandi to remain higher than competitor's price, and that Astellas' donations were motivated by revenue since it would be less expensive to give away free Xtandi than donate to the Charity PAPs); *id.* ███████████████████████████████████████ ███████████████████████████████████████████████; *id.* ¶ 11 ███████████████████████████████████████████████ ██████████████████████ ).

Astellas counters that Federal conflates a defendant's alleged motive with the remedy for the alleged misconduct, and "it is only when the remedy itself seeks to make the defendant give up what he wrongfully acquired from the plaintiff that issues of insurability arise." Pl.'s Reply/Cx-Resp. at 10. The Court agrees with

Astellas that, despite the Government's allegations and "themes" about Astellas' intent to profit from its donations to the ARI Funds, the damages sought by the Government and agreed upon in the Settlement Agreement were primarily (if not solely) compensatory damages under the FCA meant to cover the *Government's* losses in the form of Medicare payments. *Id.* at 16.

In support of its argument that the Settlement Payment is uninsurable because it was intended to deprive Astellas of "the net benefit of its wrongful acts," Federal cites to *Level 3*, 272 F.3d at 910 and its progeny. Def.'s Cx-Memo./Resp. at 9. In *Level 3*, the Seventh Circuit reversed the District Court's judgment for the insured, holding that the settlement was restitutionary in nature, as it was the "restoration of an ill-gotten gain" and therefore not covered by the insurance policy's definition of "Loss." 272 F.3d at 909–10. In the underlying suit, the plaintiffs alleged that they sold shares in their corporation to Level 3 based on Level 3's fraudulent representations, and sought as damages "the difference between the value of the stock at the time of trial and the price they had received for the stock from Level 3." *Id.* at 910. The Seventh Circuit found that such damages constitute "standard damages relief in a securities-fraud case" and are "restitutionary in character [as they] seek[] to divest the defendant of the present value of the property obtained by fraud, minus the cost to the defendant of obtaining the property. In other words, it seeks to deprive the defendant of the net benefit of the unlawful act, the value of the unlawfully obtained stock minus the cost to the defendant of obtaining the stock." *Id.*

at 910–911. The settlement amount in *Level 3* was based on a calculation of the "net benefit" obtained by Level 3 as a result of its fraudulent behavior. *Id.*

Each of the other cases cited by Federal in support of its argument that an insured is not entitled to coverage for a money it was not legally entitled is distinguishable for the same reason: each seeks damages based on a calculation of the money that the insured had wrongfully taken directly from the plaintiff. Def.'s Cx-Memo./Resp. at 10 (citing *Ryerson Inc. v. Fed. Ins. Co.*, 676 F.3d 610, 612–14 (7th Cir. 2012) (relying on *Level 3* and holding that the restitution of a profit obtained by fraud "was not a "loss" to [the insured] within the meaning of the insurance policy" where the plaintiff in the underlying suit alleged that the insured fraudulently concealed information when selling a group of subsidiaries to the plaintiff and the plaintiff and the insured settled for a partial refund of the sale amount that accounted for the loss in value resulting from the concealed information); *Foster*, 268 F. Supp. at 1045 (relying on *Level 3* and granting summary judgment to the insurer on "claims seeking purely restitutionary relief" because such claims are uninsurable as a matter of public policy but denying summary judgment on claims for which damages amounts may be measured differently); *OneBeacon Am. Ins. Co. v. City of Granite City*, 2013 WL 556533, at *3 (S.D. Ill. Feb. 13, 2013) (relying on *Level 3* and *Ryerson* to find that "the return of a fee the [insured] allegedly wrongfully charged [the underlying plaintiffs]" was undisputedly uninsurable restitution)); *see also Loc. 705 Int'l Brotherhood of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.*, 735 N.E.2d 679, 683 (2000) (holding that "the sole basis" for the settlement payment

was the plaintiff's claim that the insured had to return money improperly transferred from the plaintiff to the insured, meaning that the insured "had no right to possess [the money] in the first place").

Here, the theory of damages advanced by the Government under the FCA was the Government's own loss in the form of Medicare payments to third parties (such as pharmacies and hospitals). Pl.'s Reply/Cx-Resp. at 14 (citing Def.'s Resp. PSOAF ¶¶ 29, 30). Importantly, there has never been a calculation of the profit Astellas made from its alleged wrongful Act, as Liu told the Government that, neither he, nor anyone else at Astellas, calculated the ROI from the donations to the mCRPC funds (or the ARI Funds). And there is no evidence before the Court that the Government attempted to perform such a calculation. *See* Def.'s Resp. PSOAF ¶ 19. Rather, all of the evidence establishes that the amount of the Settlement Payment was derived from the amount of "tainted" prescriptions paid by Medicare to third parties, not on any potential profits Astellas received based on its donations to the ARI Funds. *See* Def.'s Cx-Memo/Resp. at 6; Pl.'s Reply/Cx-Resp. at 14.[15]

---

[15]Because the Court finds that the Settlement payment constituted damages rather than restitution, it need not address the Parties' arguments regarding the impact of the Primary Policy's Final Adjudication Exclusions, which bar coverage for a "Loss" if a final, non-appealable adjudication in an action establishes that the Insured gained any profit or financial advantage that was improper or illegal. Pl.'s Reply/Cx-Resp. at 17–19 (citing *Gallup, Inc. v. Greenwich Ins. Co.*, 2015 WL 1201518, at *10 (Del. Super. Ct. Feb. 25, 2015) in support of argument that, even if the Court determined that the Settlement Payment constituted restitution, it would be an insurable Loss under the Federal Policy because the inclusion of the Profit or Advantage Exclusion demonstrates that Federal contemplated coverage for restitution and determined such coverage would be precluded only by a final adjudication about it); Def.'s Cx-Reply (arguing the Court should follow *Phila. Indem. Ins. Co. v. Sabal Ins. Grp., Inc.*, 2017 WL 4310700, at *5–6 (S.D. Fla. Sept. 28, 2017), *aff'd,* 786 F. App'x 167 (11th Cir. 2019), which distinguished *Gallup* and relied in part on *Level 3* to hold that a settlement payment that was restitutionary in nature was uninsurable despite an

Astellas invites the Court to look to out-of-Circuit cases that "have rejected Federal's repeated attempts to expand *Level 3* and its progeny beyond the limited interpretative principle that the disgorgement or return of ill-gotten gains does not constitute a 'loss.'" Pl.'s Reply/Cx-Resp. at 14–15. The Court agrees that, although not binding, the cases cited by Astellas are instructive. In *William Beaumont Hosp. v. Fed. Ins. Co.*, 2013 WL 992552, *5 (E.D. Mich. Mar. 13, 2013), *aff'd,* 552 F. App'x. 494 (6th Cir. 2014), the court rejected the insurer's argument that because the defendant hospitals in an antitrust action were accused of underpaying nurses (and thereby illegally making more money), the settlement amount paid to the nurses should be characterized as "disgorgement and/or restitutionary relief." There, much as in the instant case, the underlying plaintiffs sought a multiplied damages award under antitrust laws, which the plaintiffs' expert calculated as a multiple of the amount the nurses failed to earn. *Id.* at *8. The district court rejected the insurer's claim that this relief was restitutionary, finding "that the settlements [were] wholly consistent with this focus on the injury suffered by the plaintiff RNs, as opposed to the defendant hospitals' profits or ill-gotten gains," and specifying that such a finding was consistent with the interpretive principle set forth in *Level 3. Id.* at *9–10; *see also William Beaumont Hosp.*, 552 F. App'x. at 502 (affirming district court's order granting the plaintiff's motion judgment on the pleadings and distinguishing the principle set forth

---

exclusion in the policy similar to the Final Adjudication Exclusions). The Court does, however, consider the Parties' arguments as to how the Final Adjudication Exclusions affect public policy considerations, *see infra* Section II.B.

in *Level 3* from the facts at hand in the case before it, where the insured "did not unlawfully *obtain* anything *from* the [plaintiff-]nurses").

Federal attempts to distinguish *William Beaumont Hosp.* because the definition of loss in the underlying insurance contract contains a more specific exclusion, stating that "[s]olely with respect to any Claim based upon, arising from or in consequence of profit, remuneration or advantage to which an Insured was not legally entitled, the term Loss . . . shall not include disgorgement by any Insured or any amount reimbursed by any Insured Person." Def.'s Cx-Reply at 8 (citing *William Beaumont Hosp.* 2013 WL 992552, at *5). Although the court found that the exclusion was not triggered because the claims at issue did not arise "from or in consequence of profit, remuneration or advantage to which an Insured was not legally entitled," *William Beaumont Hosp.* 2013 WL 992552, at *5, it still went on to explain that the relief sought by the plaintiffs "consists of the ordinary compensatory damages awardable in a private antitrust suit alleging violations of § 1 of the Sherman Act— a damage award that focuses on injury to the plaintiffs rather than gain to the defendant hospitals," *id.* at *11, which it held to be insurable. A similar principle applies to compensatory damages awards under the FCA, like the Settlement Payment paid by Astellas. Still, the Court recognizes that the language in *William Beaumont Hosp.* is non-binding dicta.

So too with *Chubb Custom Ins. Co. v. Grange Mut. Cas. Co.*, 2011 WL 4543896, at *11 (S.D. Ohio Sept. 29, 2011), where the district court rejected Chubb's reliance on *Level 3* and other similar cases in part because "the substance" of the plaintiffs'

claims in the underlying lawsuit were claims for damages. As the court explained: "[t]he fundamental distinction is not whether the insured received 'some benefit' from a wrongful act, but whether the claim seeks to recover only the money or property that the insured wrongfully acquired." *Id.* (citing *Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1115 (9th Cir. 2006)). But Federal correctly points out that the court found that the insured in *Chubb* did not "wrongfully acquire" any of the money it retained, thus distinguishing it from the facts of this case. Def.'s Cx-Reply at 8 (citing *Chubb Custom Ins.*, 2011 WL 4543896, at *11). Again, the principle set forth in *Chubb* is non-binding *dicta*. *See also Virginia Mason Med. Ctr. v. Exec. Risk Indem. Inc.*, 2007 WL 3473683, at *5 (W.D. Wash. Nov. 14, 2007), *aff'd,* 331 F. App'x 473 (9th Cir. 2009) (holding that that a Washington Consumer Protection Act claim brought against the plaintiff medical center in an underlying suit "did not seek to prevent unjust enrichment or to deprive [plaintiff] of the 'net benefit' of its allegedly wrongful act"; rather, the settlement "was calculated by determining the individual harm suffered by each plaintiff" in that suit, and "not by assessing [plaintiff's] gain").

Finally, Astellas points to an Illinois case in which the court rejected an insurer's attempt to conflate allegations that a defendant acted improperly to increase profits, on the one hand, with the remedy of disgorgement, on the other. Pl.'s Reply/Cx-Resp. at 16–17 (citing *Ill. Mun. League Risk Mgmt. Ass'n v. City of Genoa*, 51 N.E.3d 1133 (Ill. App. Ct. 2016)). In the case, the insurer sought a declaration that it had no duty to defend or indemnify its insured, the City of Genoa (the City), in a lawsuit brought by the Regional Transportation Authority (RTA) against the City.

*Illinois Mun. League*, 51 N.E.3d at 1134. In the underlying lawsuit, the RTA alleged that the City, which was outside the RTA's taxing authority, had schemed with a local company (the Company) to move its sales office to the City and to report falsely that all of its sales occurred in the City, when in fact the Company's sales occurred within RTA's taxing authority. *Id.* As a remedy, the RTA sought the tax revenue it lost as a result of the alleged scheme, as well as 1.5 times the amount of that lost tax revenue. *Id.* at 1135. The insurer claimed that there was no "loss" under *Level 3*, *Ryerson*, and *Loc. 705*, because the RTA was attempting to disgorge improper gains received by the City from the scheme and therefore the loss was uninsurable under Illinois law. *Id.* at 1137–38. The appellate court held that there was "no merit in the [insurer's] disgorgement and restitution argument," explaining that "[w]hile RTA's complaint alleges the City 'received an unjustified windfall in sales tax revenue,' RTA does not allege it has any right to the sales tax revenue the City actually received from the Company's sales." *Id.* at 1137. Accordingly, the court found both the lost sales tax revenue and the statutory damages (the 1.5x multiple of RTA's lost tax revenue) to be insurable loss under Illinois law. *Id.* at 1137–38.

Federal argues that *Illinois Mun. League* is inapposite, as the "court found that the amounts in that case were covered loss because the underlying plaintiff was not explicitly seeking restitution from the insured or trying to disgorge money from the insured that belonged to the plaintiff, whereas here "the government was absolutely seeking 'restitution' from Astellas." Def.'s Cx-Reply at 10 (citing 51 N.E.3d at 1137–38). As discussed above, the Court has already rejected Federal's argument that the

DOJ was seeking restitution from Astellas. Therefore, it finds *Illinois Mun. League* to be persuasive, on-point authority. The Court agrees with Astellas that *Level 3* and its progeny are distinguishable and this is not a "net benefit" case. Pl.'s Reply/Cx-Resp. at 17.

Here, Federal bears the burden of establishing the "uninsurable under Illinois law" exception applies, and, for the reasons described above, it has failed meet its burden.

### d.  Other Possible Alleged Violations

Federal argues that, even if the Court holds that the FCA does not provide for uninsurable restitution (which the Court has held), the Settlement Agreement did not release only FCA claims, but also, among other things, unjust enrichment claims pursuant to which the Government could directly seek disgorgement of profits. Def.'s Cx-Memo./Resp. at 14–16. Federal also relies on Gallagher's testimony that the DOJ does not allege or investigate statutory violations, but rather alleges and investigates "bad conduct," and such alleged "bad conduct" is delineated in the CID issued to Liu. R. 127, Def.'s Cx-Memo./Resp. (Sealed) at 15.

Astellas argues that, even if the DOJ *could* have pursued other claims, such as those enumerated in the Settlement Agreement, it did not. It points to the Subpoena, which states that the DOJ was investigating "Federal health care offenses" (and does not list common law claims). Pl.'s Reply/Cx-Resp. at 21 (citing PSOF ¶ 27). And the Tolling Request (the "Claim" at issue here), states that the DOJ is "conducting a joint criminal and civil investigation" into possible violations of two federal criminal

statutes, including the AKS, and "certain civil statutes, including, but not limited to, [the FCA], in connection with Astellas's payments to so-called '501(c)(3)' organizations that provide financial assistance to Medicare beneficiaries." *Id.* (citing PSOF ¶ 34). The CID to Liu is even more explicit, stating that it was "issued pursuant to the [FCA] investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729." Def.'s Resp. PSOF ¶ 23; *see also* Gallagher Suppl. Decl., Exh. H. Still, the Court agrees with Federal that the evidence before the Court establishes that the DOJ was investigating Astellas' *conduct* related to its donations to the mCRPC funds and not just violations of one statute. Def.'s Cx-Memo./Resp. at 15; *see also* Pl.'s Resp. DSOAF ¶ 7. But the evidence *is undisputed* that the primary focus of the DOJ Investigation was a violation of the FCA with an underlying AKS violation. *See* Pl.'s Reply/Cx-Resp. at 21–22; *see also* Gallagher Suppl. Decl., Exh. H; Gallagher Dep. Tr. at 23:13–24:22.

The Court agrees with Astellas that *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339 (7th Cir. 2010) controls. Pl.'s Reply/Cx-Resp. at 21. In *Santa's Best*, the Seventh Circuit predicted that, under Illinois law, in determining whether a policyholder is entitled to coverage for the entire settlement payment, a district court must find only that the covered loss was a "primary focus" of the underlying action. *Santa's Best*, 611 F.3d at 350. *Santa's Best* relied heavily on *Fed. Ins. Co. v. Binney & Smith, Inc.*, 913 N.E.2d 43, 53–54 (Ill. App. Ct. 2009), and other Illinois precedent to hold that an insurer must reimburse an insured for the entire settlement payment when (1) "the settlement was made in 'reasonable anticipation

of liability' for damage covered by the insurer's policies," and (2) "the settlement's primary focus was a claim covered under the insurer's policy." 611 F.3d at 350-51. So then, Astellas bears the burden of demonstrating that a "primary focus" of the settlement was a "potentially covered loss." *Id.* at 352. Conversely, if Federal can establish "that the claims were not even potentially covered . . . then [it] is not required to reimburse the settlement." *Id.*

The Court finds that Astellas has satisfied its burden, as the undisputed evidence before the Court demonstrates that the primary focus of the DOJ's investigation and subsequent settlement was a violation under the FCA, and contrary to Federal's position, Def.'s Cx-Reply at 17, a settlement payment made pursuant to an alleged FCA violation is compensatory and insurable under Illinois law and therefore is a covered loss.

## B. Public Policy

Even though the Court finds that the Settlement Payment is covered by the Federal Policy because it constitutes damages, it still must determine whether Federal's coverage of the Claim is contrary to public policy. Federal argues that the Court must grant summary judgment in its favor because public policy prohibits insurance coverage for liability arising directly from an insured's intentional or willful wrongs, like Astellas' conduct alleged in the Settlement Agreement. Def.'s Cx-Memo./Resp. at 16–17. Predictably, Astellas contends that public policy does *not* prohibit coverage of the Settlement Payment. Pl.'s Reply/Cx-Resp. at 22–25.

### 1. Insurance Coverage of Fraud

Federal concedes that the FCA does not require a specific intent to defraud—rather a defendant can be liable because of "deliberate indifference" or "reckless disregard" to the possibility that the submitted claim was false. Def.'s Cx-Memo./Resp. at 20. But, it argues that intent to defraud absolutely was at issue in the instant case based on the DOJ's theories and allegations about Astellas' conduct and because the FCA claim arose from alleged violations of the AKS, which requires that a party "knowingly and willfully" offered, paid, solicited, or received remuneration in return for purchasing or ordering any item or service for which payment may be made under a federal healthcare program. *Id.* (citing 42 U.S.C. §1320a-7b; *United States v. Walgreen Co.*, 417 F. Supp. 3d 1068, 1098 (N.D. Ill. 2019)). The Court agrees with Federal that the evidence establishes that the Investigation and subsequent Settlement Agreement were based upon Astellas' *knowingly* fraudulent conduct. *See* Gallagher Dep. Tr. at 23:13–24:22 (testifying that he knew the DOJ was investigating an AKS violation and only question was whether it was civil or criminal); Def.'s Resp. PSOF ¶ 27 (Subpoena stated Investigation included an AKS investigation); *id.* ¶ 34 (Tolling Agreement stated same); *id.* ¶ 46 (detailing "Covered Conduct" released in Settlement Agreement, including that "Astellas knew that Xtandi would likely account for the vast majority of utilization from each [ARI F]und" and while "the ARI [F]unds were open, Astellas promoted the existence of the ARI [F]unds as an advantage for Xtandi over competing mCRPC drugs in an effort to persuade medical providers to prescribe Xtandi"); Pl.'s Resp. DSOAF ¶ 13 (the DOJ was "interested in, among [] other things . . . that Astellas *knew* that it could increase

its price [of Xtandi] to increase revenue because patients would be fully supported by the ARI [F]und[s]") (emphasis added); Gallagher Suppl. Decl. Exh. E at A-442 ██████ ████████████████████████████████████████████████████████████████ ████████████████████ .

But Astellas is right that such fraudulent conduct is only *alleged*; Astellas did not admit to the Government's allegations in the Settlement Agreement nor to liability to the Government. Def.'s Resp. PSOF ¶ 46. And Federal has not presented any evidence to the contrary.

Federal contends that it is "contrary to [Illinois] public policy to insure liability arising directly from an insured's intentional or willful wrongs." Def.'s Cx-Memo./Resp. at 16–17. But the cases cited by Federal do not directly stand for the principle that an insurer cannot contract to cover damages caused by an insured's allegedly fraudulent conduct. For instance, *Mortenson v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 249 F.3d 667, 672 (7th Cir. 2001) lists certain kinds of insurance as being against public policy "because of the acute moral hazard that the insurance creates," including criminal fines, punitive damages, life insurance on another person's life without consent, but *not fraud. See also Beaver v. Country Mut. Ins. Co.*, 420 N.E.2d 1058, 1061 (Ill. App. Ct. 1981) (public policy prohibits coverage for *punitive damages* arising from insured's own misconduct). True, in *Ryerson*, the Seventh Circuit held that "there is no insurable interest in the proceeds of a fraud . . . and no state would enforce such an insurance policy if one were written." 676 F.3d at 613. But, as indicated by the plain text of the opinion (and discussed in more depth

above, *see supra* Section II.A.2.c), the court found that public policy would bar coverage for recovery of the *proceeds* of a fraud. Here, the Settlement Payment was for *damages* to the Government, not for Astellas' proceeds. *See supra* Section II.A.2.a–d. Moreover, *Ryerson* does not rely on any Illinois cases in support of its holding—of course this Court is bound to follow Seventh Circuit precedent, but the facts of *Ryerson* are distinguishable from the instant facts and it is not clear that there is a body of Illinois law prohibiting coverage for any kind of damages arising out of fraudulent conduct. And Federal has not cited nor is the Court aware of any cases that stand for the proposition that it is against Illinois public policy to insure the payment of *damages* to a third party resulting from an insured's fraudulent conduct.

Indeed, the Court agrees with Astellas that Illinois courts have held that there is in fact no general Illinois public policy prohibiting insurance for damages caused by the insured's intentional acts, unless the insured wrongdoing is the one to recover the proceeds. *Dixon Distrib. Co. v. Hanover Ins. Co.*, 641 N.E.2d 395, 401 (Ill. 1994) (insurance coverage for retaliatory discharge was not against public policy) (internal citations omitted); *Univ. of Ill. v. Cont'l Cas. Co.,* N.E.2d 1338, 1351 (Ill. App. Ct. 1992) (holding that it was not against public policy to insure claims involving violations of constitutional and statutory rights predicated on alleged intentional misconduct and noting that the public policy considerations precluding insurance coverage for self-inflicted injury [such as arson] are less persuasive when tortious liability to innocent third parties is involved); *Ill. Farmers Ins. Co. v. Keyser*, 956 N.E.2d 575, 579 (Ill. App. Ct. 2011) (public policy did not prohibit coverage for

intentional tort of malicious prosecution, as "[i]ndemnity against intentional misconduct may be tolerated where it provides benefits to the victim, but not where it compensates the wrongdoer"). Still, none of these cases addresses whether Illinois public policy prohibits covering claims involving allegations of *fraud*, and in the absence of such a policy, the Court will not invent one.

## 2. Final Adjudication Exclusions

As Astellas correctly points out, Illinois courts "have a long tradition of upholding the right of parties to freely contract." *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 644 (Ill. 2011). And "[a]n insurance policy, like any contract, is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). Here, the Primary Policy's Final Adjudication Exclusions explicitly exclude coverage for any "Loss" "arising out of, based upon or attributable to any deliberate fraudulent act or any willful violation of law by an Insured if a final non-appealable adjudication in an action or proceeding other than an action or proceeding initiated by the Insurer to determine coverage under the policy establishes that such act or violation occurred." Def.'s Resp. PSOF ¶¶ 67–68. Although Federal is adamant that it does not argue that the Final Adjudication Exclusions are against public policy, and thus the Court should not consider them, Def.'s Cx-Memo./Resp. at 18 n.9, the Court agrees with Astellas that they inform the analysis about the parties' intent and whether potential policy

concerns outweigh the principle of upholding contracts as written, Pl.'s Reply/Cx-Resp. at 23–24.

It is undisputed that there has been no final adjudication of the Government's claims against Astellas. Def.'s Resp. PSOF ¶ 46. As discussed above, the Court finds the Delaware Supreme Court case, *Murdock*, 2021 WL 803867, cited in Astellas' motion to file supplemental authority, to be instructive. In *Murdock*, the Delaware Supreme Court addressed the issue of whether an excess insurer was excused from covering a company's settlements of fraud-based claims under a directors' and officers' liability insurance policy (D&O policy). 2021 WL 803867, at *1. Among other things, the court addressed "whether the policy, to the extent that it appears to cover losses occasioned by one of the insureds' fraud, is unenforceable as contrary to the public policy of Delaware; [and] whether a policy provision that excludes coverage for fraudulent actions defeats coverage." *Id.* at *1. The court determined that fraud-based claims are insurable under D&O policies containing coverage terms and exclusions materially identical to the terms of the Primary Policy. It held:

> We start our analysis by reaffirming our respect for the right of sophisticated parties to enter into insurance contracts as they deem fit "in the absence of clear indicia that . . . [a countervailing public] policy exists." As described earlier, the Policy has an expansive definition of covered losses, which on its face does not exclude losses occasioned by fraud.
>
> Allegations of fraud fit comfortably within these terms defining the scope of coverage. Indeed, the Policy's exclusion of losses "based upon, arising out of or attributable to . . . any deliberately . . . fraudulent act," but only if "established by a final and nonappealable adjudication," implies that fraud that does not fall

within the exclusion because it has not been finally adjudicated will otherwise be covered.

*Id.* at *10.

Federal is correct that *Murdock* was explicitly decided under Delaware law. Def.'s Resp. Suppl. Auth. (citing 2021 WL 803867, at *10). Indeed, the court relied heavily on Section 145 of the Delaware Corporations Law, 8 Del. C. 145, in finding that Delaware policy "weighs in favor of the insurability of losses incurred as the result of a breach of the duty of loyalty, including one marred by fraud." 2021 WL 803867, at *12. No such similar statute exists in Illinois; nor has Astellas cited to Illinois caselaw standing for a similar proposition of law.

Federal also argues that *Level 3* precludes coverage for settlements premised on allegations of fraud. Def.'s Reply at 20 (citing *Level 3*, 272 F.3d at 911). In *Level 3*, the Seventh Circuit rejected the insured's argument that "[a]s long as the case is settled before entry of judgment, the insured is covered regardless of the nature of the claim against it," stating, "[t]hat can't be right." 272 F.3d at 911. The Court agrees with Astellas, however, that this is merely dicta, as the court discussed whether it would matter for coverage purposes if a claim for fraud resulting in uninsurable disgorgement (1) settled on the eve of trial and was shown to have merit, or (2) was shown to be meritless but still settled. *Id.* The court ultimately decided that it "need not decide" as it could "find no guidance on the point from cases or other materials." *Id.*

Moreover, in support of its statement that coverage for claims settled before judgment "can't be right," the court cited just one *New York* case. *Level 3*, 272 F.3d at

911 (citing *Reliance Grp. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 188 A.D.2d 47, 55 (N.Y.S. March 2, 1993)). As noted above, this Court must follow Seventh Circuit law; however, again Federal cites no, and the Court is unaware of any, *Illinois* cases holding that allegations of fraud—or other arguably uninsurable acts—that settle before trial are uninsurable. In fact, Astellas cites the only Illinois case that is somewhat on point. In *Gulliver's E., Inc. v. Cal. Union Ins. Co.*, 455 N.E.2d 264, 265 (Ill. App. Ct. 1983), the insurer issued a fire insurance policy to the insured, which included a provision that defense of arson (Arson Defense Provision) would not be available to the insurer unless there was an indictment and conviction of the insured's principal stockholders. Nonetheless, after fire damaged the insured's restaurant, the insurer denied the claim on basis that its investigation revealed that fire was intentionally set by the insured. *Id.* The Illinois Appellate Court affirmed the trial court's finding that Arson Defense Provision was not void as against public policy, even though Illinois "has a public policy of discouraging the intentional burning of property for profit." *Id.* at 265–66. True, the holding in *Gulliver's E.* was limited to the facts of the case, but the case indicates that Illinois law allows for insurance coverage of claims that potentially disturb public policy so long as there is no final adjudication of such.

Here, as discussed above, the Settlement Payment is insurable as a Loss under the Federal Policy—as it is a payment for the Government's damages (not disgorgement of Astellas' profits)—and does not fall under the Final Adjudication Exclusions, as there has been no final adjudication. The Court reads the Final

Adjudication Exclusions, like the exclusion clause in *Murdock*, to imply that non-adjudicated *allegations* of fraud that do not fall within the exclusion will otherwise be covered. 2021 WL 803867, at *1. And under standard contract interpretation principles, the Court must consider the entire Federal Policy (and underlying Primary Policy) and give effect to every clause, including the Exclusion Clauses. *See Cent. Ill. Light*, 821 N.E.2d at 213. Therefore, when weighing the *articulated* Illinois public interest in the Parties' freedom to contract, *see Phoenix Ins.*, 949 N.E.2d at 644, against a public interest in preventing insurance coverage for allegations of fraud (which is not supported by any Illinois case cited by the Parties or that the Court is aware of), the Court must find that the Settlement Payment is covered under the Federal Policy and such coverage does not offend public policy.

## Conclusion

For the reasons given above, Astellas' Motion for Summary Judgment [114] is granted. Federal's Cross-Motion for Summary Judgment [126], [129] is denied. Astellas' motion to deem admitted Astellas' statements of additional material fact [155] is granted in part and denied in part. Astellas' motion for leave to file supplemental authority [159] is granted. Federal's sealed statement of additional facts [165] is terminated as a motion. The Court will enter judgment in Astellas' favor after the Parties file the following submissions on prejudgment interest: Astellas is given until October 7, 2021, to provide the Court its requested amounts and

documentary support for such amounts; Federal is given until October 14, 2021 to respond.

Dated: September 23, 2021
Updated: October 8, 2021

_____
United States District Judge
Franklin U. Valderrama